**UV INDUSTRIES, INC., Plaintiff,**

v.

**Victor POSNER, Sharon Steel Corporation, et al., Defendants.**

**Civ. No. 79–58–SD.**

United States District Court, D. Maine, S. D.

Feb. 26, 1979.

Kurt Koegler, New York City, Sumner T. Bernstein, Leonard M. Nelson, Gordon Grimes, Eric F. Saunders, James H. Young II, Portland, Maine, for plaintiff.

Werner L. Polak, Dennis Friedman, John Klug, Shearman & Sterling, New York City, Howard H. Dana, Jr., John A. Mitchell, Robert A. Moore, Peter B. Webster, Verrill & Dana, Portland, Maine, for defendants.

Richard Urowsky, New York City, Ernest J. Babcock, James B. Zimpritch, Portland, Maine, for amicus curiae Goldman, Sachs & Co.

## BENCH RULING OF THE COURT UPON PLAINTIFF'S PRAYER FOR A PRELIMINARY INJUNCTION

GIGNOUX, District Judge.

The plaintiff UV Industries, Incorporated, (UV) filed a verified complaint with accompanying affidavits in the Cumberland County, Maine, Superior Court Sunday, February 25, 1979, seeking temporary, preliminary and permanent injunctive relief to prevent the consummation of a proposed purchase of 1,300,000 shares of the common stock of UV by the defendant, Sharon Steel Corporation (Sharon) for an aggregate purchase price of more than $45,000,000. The proposed purchase of said stock is alleged to be in contravention of the requirements of the Maine Takeover Bid Disclosure Law, 13 M.R.S.A. § 801 *et seq.* (the Maine Takeover Law). The defendant, Sharon, appeared and filed a petition to remove the complaint to this Court pursuant to 28 U.S.C. § 1441(b), removal jurisdiction being predicated upon the existence of diversity of citizenship, and the requisite jurisdictional amount, as between the plaintiff, UV, and the defendant, Sharon, Sharon being the only defendant properly joined and served. Following removal, a conference of counsel was had in this Court's chambers beginning at 8:30 a. m. on Monday, February 26th. After consideration of the verified complaint, the affidavits and the arguments of counsel, this Court issued a temporary restraining order at 10:45 a. m. on that day restraining any purchase of stock in UV by the defendant Sharon until 6 p. m. on the following day, Tuesday, February 27th. In the same order, the Court scheduled for 2 p. m. on Tuesday, February 27, 1979, a hearing on the plaintiff's request for a preliminary injunction. The scheduled hearing on the plaintiff's prayer for a preliminary injunction was held commencing at 2 p. m. and continuing until approximately 7 p. m. At that hearing the parties presented the testimony of four witnesses, three depositions and various affidavits, which constitute the record before the Court at this time. In addition to the plaintiff UV and the defendant Sharon, Goldman, Sachs & Co., the broker-dealer which had assembled the 1,300,000 shares of UV stock in question, was permitted to participate in the hearing as amicus curiae. During the course of the hearing, the Court continued the temporary restraining order previously issued until the Court should have determined whether a preliminary injunction should issue. The relevant facts developed at this hearing will be briefly summarized.

Plaintiff, UV Industries, Inc., is a corporation organized and existing under the laws of the State of Maine. Its principal place of business is at New York City, New York. UV is a public company whose stock is listed on both the New York and Pacific Stock Exchanges. UV has approximately

13,050,187 shares of common stock outstanding. These shares are registered pursuant to Section 12 of the Securities and Exchange Act of 1934. As of September 30, 1978, UV had assets in excess of $600,000,000 and approximately 10,000 shareholders. UV is engaged, among other things, principally in the manufacture of electrical equipment through its wholly-owned subsidiary, Federal Pacific Electric Company, in the fabrication of copper and brass products, the extraction of natural resources and the manufacturer of electronic components.

Defendant Sharon Steel Corporation is a Pennsylvania corporation. Its principal executive offices are in Ohio. Sharon's common stock is registered on the Pacific Stock Exchange. Another corporation, NVF Company, owns 85.6% of the outstanding voting securities of Sharon. Sharon became a stockholder of UV in October, 1975. As of December 18, 1978, Sharon held approximately 22% of UV's common stock. This assumes that there had, as of that date, been no conversion of UV's 5¾% convertible subordinated debentures (convertible at $22.45 per share), $1.265 new preferred stock, and no exercise of warrants outstanding, which are exercisable at $20.655 per share. If such debentures and preferred stock were converted and such warrants exercised, UV's outstanding common stock would be increased by approximately 6,000,000 shares, to a total of approximately 19,050,187 shares. The result would be to dilute Sharon's holding in UV common stock from approximately 22% to approximately 13.5%.

On December 18, 1978, UV announced that it had entered into an agreement to sell all the outstanding stock of its subsidiary, Federal Pacific Electric Company, subject to shareholder approval. UV also announced at this time that it was considering a proposed plan of liquidation and dissolution, likewise subject to shareholder approval. Upon the announcement of these plans, UV's stock, which had closed at $19½ per share on December 15, reached a high of $23¼ per share by the close of business on December 19th. It thus became apparent that the exercise of both the conversion rights and the warrants of UV holders might become attractive.

By letter dated December 20, 1978, NVF Company (which, as mentioned, owns 85.6% of Sharon's voting securities) informed UV's Chief Executive Officer that Sharon intended to acquire additional UV shares as might be necessary to maintain the level of Sharon's holdings at approximately 22%. A copy of this letter was filed with the Federal Trade Commission. Sharon also filed with the Securities & Exchange Commission an amendment to its Schedule 13D on December 22nd. Sharon further filed, on December 27th, with the Federal Trade Commission a notification and report form pursuant to Section 7A of the Clayton Antitrust Act. Both of these filings contained verbatim language from NVF's letter to UV of December 20, 1978.

On January 18, 1979, UV announced that it would recommend the proposed plan of liquidation to its shareholders. Subsequent to this announcement and through February 14th, UV's common stock traded at a price of around $32⅞ per share. A special meeting of UV stockholders to vote on the proposed sale of Federal Pacific Electric Company stock and the plan of liquidation has been scheduled for March 26. The record date establishing stockholders' right to vote at that meeting has been set for today, February 28. The proxy statement for that meeting was published last Tuesday, February 20. The proxy statement announced, among other things, that upon liquidation at least $18.00 per share would be distributed to UV's stockholders. Testimony at the preliminary injunction hearing indicated that this distribution could be as high as $35.00 to $40.00 per share.

Sharon contacted Goldman, Sachs & Co., a New York City investment banking firm, on Wednesday, February 21. At that time Sharon indicated to Goldman, Sachs Sharon's interest in acquiring a block of between 1,000,000 and 1,500,000 shares of UV common stock. On the following day, Thursday, February 22, Goldman, Sachs

committed to sell to Sharon, in a cash basis transaction, approximately 1,300,000 shares of UV common stock at $34⅞ per share. The 1,300,000 shares represents approximately 10% of UV's outstanding common stock. The purchase price aggregates in excess of $45,000,000. Goldman, Sachs held in its own account only 240,000 shares of UV common stock. The balance of the 1,300,000 shares committed came from a number of other sources. These included outstanding orders to sell on the New York Stock Exchange and an undetermined number of Goldman, Sach's large institutional and individual customers, who were contacted by Goldman, Sachs account executives and provided an opportunity to participate in the transaction. This transaction was reported at approximately 2:30 p. m. on the same day, Thursday, February 22, on the New York Stock Exchange Composite Tape, although the identity of the purchaser was not disclosed. This cash basis transaction, if permitted, would have been consummated within 24 hours. If the transaction were to be consummated on a so-called "regular way" basis, it would not be consummated until five business days after the agreement to purchase and sell.

Sharon asserts that the cash basis transaction was undertaken in order to assure that it would be the record owner of the UV stock in question on the record date, February 28, 1979, and thus have the right to vote the purchased shares at the March 26 shareholders meeting where the proposed sale of Federal Pacific Electric Company stock and the plan of liquidation of UV will be presented for shareholder approval. Testimony at the preliminary injunction hearing established that it would not be unusual for a cash basis transaction to occur near to a record date for the purpose Sharon asserts. Mr. Edlow, however, a general partner at Bear, Stearns & Co., another New York investment banking firm, and a specialist in risk arbitrage, testified at the hearing that he had never seen a cash transaction of this magnitude in his experience regardless of what the motivation might be. UV contends that Sharon's objective in this transaction is to block the proposed sale of Federal Pacific Electric Company stock and the proposed liquidation of UV, thereby depressing the value of the common stock held by other UV shareholders. This depressed value, UV contends, would make it difficult for its shareholders to sell their stock to anyone other than Sharon.

In making its offer to purchase the 1,300,000 shares of UV stock, Sharon has not complied with the requirements of the Maine Takeover Law.

■ It is well settled law that, in the ordinary case, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.. 11 Wright & Miller, *Federal Practice and Procedure* § 2948 at 430–31 (1973). In order to prevail, plaintiffs, in the ordinary case, must satisfy each of these four criteria. *Levesque v. Maine,* 587 F.2d 78 (1st Cir. 1978); *see Keefe v. Geanakos,* 418 F.2d 359 (1st Cir. 1969); *Automatic Radio Manufacturing Co. v. Ford Motor Co.,* 390 F.2d 113 (1st Cir.), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

■ The Court is persuaded that plaintiff has satisfied each of these requirements for the issuance of a preliminary injunction and therefore is entitled to the relief it presently seeks.

■ As has been stated, the first of the four showings which, in the ordinary case, a plaintiff must make before it is entitled to a preliminary injunction is that it will suffer irreparable injury if the injunction is not granted. Where, however, a statute provides for injunctive relief upon the showing of a violation, the party seeking such relief need not make a showing of irreparable harm in the normal equity sense. *See* 7 Moore's Federal Practice

§ 65.04(1) n. 7b, and cases there cited. The rationale for such an exception with respect to injunction suits which are "creatures of statute" is that the party bringing the suit is acting to vindicate the public interest. *See S. E. C. v. Management Dynamics,* 515 F.2d 801, 808 (2d Cir. 1975). As the Supreme Court stated in *Hecht v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), "standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases."

■ In the instant case, the Maine Takeover Law provides for injunctive relief upon a showing of a violation. Such relief may be obtained either by the Superintendent of Banking, 13 M.R.S.A. § 812(1), or by, among others, a target company, 13 M.R.S.A. § 812(2). This is a statutorily-created cause of action which is designed to protect the public interest in full disclosure to stockholders of Maine corporations. This case, therefore, falls within the exception to the requirement that a plaintiff must make a showing of irreparable injury in the normal equity sense when seeking a preliminary injunction. For these reasons, the Court is persuaded that the plaintiff in this case need not have made such a showing.

■ Alternatively, however, the Court finds that UV has in fact made an adequate showing in this case that it will suffer irreparable injury if a preliminary injunction does not issue. It is clear from this record that if no preliminary injunction issues, the sale will be consummated, and $45,000,000 will be dispersed to an undetermined number of sellers. Thus, if the sale is consummated, it will be "virtually impossible" for a court to "unscramble the eggs." *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir. 1969). In addition, the Maine Takeover Law seeks to protect Maine corporations and their stockholders against undisclosed takeover offers not made to all shareholders, but only to a selected group. 13 M.R.S.A. §§ 801 and 809(5). If this proposed

sale proceeds without compliance with the filing and disclosure requirements of the Maine statute, then the shareholders of UV who were not provided an opportunity to participate will immediately and irreparably be denied the benefits of that protection. This denial is not compensable by money damages. These factors are plainly sufficient to establish an adequate showing of irreparable injury if such a showing were required. *See Sonesta International Hotels Corp. v. Wellington Associates, supra; Electronic Specialty Co. v. International Controls Corp., supra.*

The second requirement which a plaintiff must satisfy in order to obtain a preliminary injunction is that the injury which it will sustain if a preliminary injunction does not issue outweighs any harm which the granting of injunctive relief would inflict on the defendant. The injury to the plaintiff and its stockholders, together with the detriment to the public interest, if a preliminary injunction does not issue, as noted above, clearly outweigh any harm which the defendant Sharon has alleged that it will suffer if a preliminary injunction does issue. Sharon's only claim of injury is that if it does not consummate the proposed purchase today, it will be unable to vote these shares at the March 26 stockholders meeting. This Court has no doubt, however, of its power to fashion appropriate relief if it is ultimately determined, after a full hearing on the merits, that a preliminary injunction was erroneously issued. Moreover, this is a court of equity, and the defendant's claimed injury can only be said to result from its own actions in failing to comply with the Maine Takeover Law. Had the defendant complied with that statute, it would not be in this court today.

■ The third requirement which a plaintiff must satisfy in order to obtain a preliminary injunction is a likelihood of success on the merits. In this Circuit, a plaintiff is required to show at most a probability, *Keefe v. Geanakos, supra,* at 360; *Automatic Radio Manufacturing Co. v. Ford Motor Co., supra,* at 115, and at least a substantial possibility, *Tuxworth v. Froehlke,*

449 F.2d 763, 764 (1st Cir. 1971), of prevailing on the merits, in order to satisfy this criterion of demonstrating a likelihood of success on the merits. The Court has concluded that the plaintiff has made such a showing.

Sharon contends that the activities engaged in by Goldman, Sachs in assembling the block of UV shares do not constitute a "takeover bid or takeover offer" as defined by 13 M.R.S.A. § 802(16), and that hence the transaction is not within the purview of the Maine Takeover Law. The cases Sharon cites, however, are distinguishable from the present action in that they deal with the definition of a tender offer in the context of the Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) (1976). *See, e. g., Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 449 F.Supp. 951, 961 (S.D.N.Y.), *aff'd in part, rev'd in part,* 584 F.2d 1195 (2d Cir. 1978); *D–Z Investment Co. v. Holloway,* 1974–75 Fed.Sec.L.Rep (CCH) (Transfer Binder), Par. 94,771 at 96,562–63 (S.D.N.Y. 1974); *Nachman Corp. v. Halfred,* 1973–74 Fed.Sec.L.Rep (CCH) (Transfer Binder), Par. 94,445 (N.D.Ill.1973); *Walter & Wall Associates, Inc. v. American Consumer Industries, Inc.,* 1973 Fed.Sec.L.Rep (CCH), Par. 93,943 (D.N.J.1973).

The Williams Act, unlike the Maine statute, does not itself define the term "tender offer." These cases have judicially defined the term "tender offer" in light of the perceived objectives of the Williams Act. The Maine statute, however, defines, in § 802(16), the term "takeover bid or takeover offer" (which the Court will hereafter refer to simply as a "takeover offer") for the purposes of the Maine statute. We are not concerned in this case with what types of transactions are subject to the disclosure and filing requirements of the Williams Act. This action is predicated on an alleged violation of the Maine Takeover Law. The Court must, therefore, address itself to the definition of a takeover offer contained in § 802(16), in order to determine whether the present transaction constitutes a takeover offer and is, therefore, subject to the disclosure, filing, approval and other requirements of the Maine statute.

Subsection (A)(1) of § 802(16) of the Maine Takeover Law broadly defines a takeover offer to include "an offer of cash . . . made by an offeror . . . through an agent . . . to offerees to purchase the number of shares of any class of equity securities of the target company that: (1) together with the offeror's presently owned shares of that class, will in the aggregate exceed 5% of the outstanding shares of the class." It cannot be disputed that the offer here made by Sharon falls within the definition of a takeover offer contained in subsection (A)(1) of § 802(16). Sharon currently owns at least 13.5%, if conversion rights and options have been exercised, and possibly 22%, if such rights have not been exercised, of the outstanding common stock of UV. The proposed purchase of 1,300,000 shares was an offer of cash made by an offeror, Sharon, through its agent, Goldman, Sachs, to purchase approximately 10% of UV's outstanding common shares. While it is evident that the transaction also falls within the definition of a takeover offer contained in subsection (A)(2) of § 802(16), the Court does not deem it necessary to discuss that section, inasmuch as the Court has concluded that the transaction plainly falls within the definition set forth in subsection (A)(1).

The transaction being clearly a takeover offer within the purview of subsection (A)(1) of § 802(16), the transaction is subject to the various requirements of the Maine statute unless it can be shown to be an excluded transaction, as such transactions are defined in subsection (B) of § 802(16). Subsection (B) of § 802(16) provides that six types of transactions are not to be included within the definition of a takeover offer. The only listed exclusions that could conceivably apply to the present transaction are those set forth in subsections (B)(1) and (B)(4). Subsection (B)(1) excludes from the definition of a takeover offer "an isolated offer to purchase shares from not more than 10 individual shareholders during any period of 12 consecutive months, not made to shareholders general-

ly." It is clear on this record (the Court refers particularly to the affidavit of Robert E. Rubin, a general partner of Goldman, Sachs, at Paragraphs 4 and 5, and also to Mr. Rubin's deposition testimony) that the offer to purchase 1,300,000 shares of UV common stock was made to more than 10 individual shareholders by Sharon through Goldman, Sachs acting as Sharon's agent. To read subsection (B)(1) not to apply to a transaction such as this, as Sharon suggests that subsection should be read, would immunize from the requirements of the Maine Takeover Law any transaction otherwise falling within the purview of the statute, when consummated through the medium of a broker. To immunize any such transaction because handled through a broker would nullify and frustrate the objectives of the Maine Legislature in enacting the Maine Takeover Law.

The second exclusion which might conceivably apply to this transaction is that set forth in subsection (B)(4). Subsection (B)(4) excludes from the Act's definition of a takeover offer "an offer effected by or through a broker-dealer in the ordinary course of his business *without solicitation of orders* to sell equity securities of the target company." (emphasis added) The record developed at yesterday's hearing compels the inference that Goldman, Sachs, through its account executives, solicited orders to sell, from its customers and others, for the purpose of putting together this block transaction for Sharon. These solicitations removed the transaction from any exclusion provided by subsection (B)(4).

In sum, the Court is persuaded that the offer made by Sharon to purchase on a cash basis 1,300,000 shares of UV common stock constitutes a takeover offer as defined by § 802(16) of the Maine Takeover Law.

It is uncontroverted that Sharon has violated the disclosure, filing and approval requirements of the Maine Takeover Law. See 13 M.R.S.A. §§ 803, 804, 808(1). It is also undisputed that Sharon has violated the Maine statute's requirement that an offeror not make a takeover offer which is not made to all the owners of equity securi-

ties of the target company. See 13 M.R. S.A. § 809(5). It follows that plaintiff has borne its burden of showing a probability, or at least a substantial possibility, of prevailing on the merits regarding its contention that Sharon has violated that statute.

Given the Maine Takeover Law's applicability to the transaction at hand, the defendant argues that the statute is unconstitutional in that (1) it violates the Supremacy Clause of the United States Constitution because the regulation of takeover offers is preempted by the Federal Securities Laws, specifically, the Williams Act, and (2) it infringes upon interstate commerce in violation of the Commerce Clause of the United States Constitution. It would not be proper, however, for this Court to rule upon the constitutionality of the Maine Takeover Law after an expedited and incomplete hearing such as that which was held in the present case. Issues of constitutionality must be accorded a full hearing, where all parties have the opportunity to fully develop a complete factual background and to fully brief and argue their respective positions. It is common practice for courts not to decide the constitutionality of a statute where, because of the urgency of the matter, the opportunity for the kind of deliberation warranted by the gravity of the issues presented, does not and cannot exist. Indeed, at least one case has held that a district court should not, on a motion for preliminary injunction, decide as to the constitutionality of a statute. *Seagram Distillers Corp. v. New Cut Rate Liquors,* 221 F.2d 815, 820 (7th Cir. 1955). See also *Rhode Island Minority Caucus, Inc. v. Baronian,* 590 F.2d 372 at 374 (1st Cir. 1979). The Court has concluded that the present action presents precisely the type of situation which makes it inappropriate for this Court to dispose summarily, one way or the other, of the significant and substantial constitutional questions presented by the Maine Takeover Law. A cursory examination of the briefs submitted by the parties and of the authorities to which the parties have referred shows that there is much controversy among both courts and com-

 

mentators as to the constitutionality of state takeover statutes. *Compare Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978), *prob. juris. noted,* —— U.S. ——, 99 S.Ct. 829, 59 L.Ed.2d 30 (1979) with *Note, Securities Law and the Constitution: State Tender Offer Statutes Reconsidered,* 88 Yale L.J. 510 (1979) *and Note, The Constitutionality of State Takeover Statutes: A Response to Great Western,* 53 N.Y.U.L.Rev. 872 (1978). *See also Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Given both the far-reaching analysis that would be necessary and the potential impact that could result from a constitutional determination as to either the validity or the invalidity of the Maine Takeover Statute, this Court is not in any position today to undertake such an important task.

The final requirement which a plaintiff must satisfy in order to be entitled to a preliminary injunction can be dealt with briefly. It is that the public interest will not be adversely affected by the granting of the injunction. Plainly, in the present case the public interest will not be adversely affected by the granting of an injunction, the effect of which will be to require compliance with a statute enacted by the legislature of the State of Maine. In its preamble, the Takeover Law states that the "legislation is necessary to provide adequate protection for shareholders, Maine corporations and the public from the use of takeover offers without first receiving full and fair disclosure of information concerning them." 13 M.R.S.A. § 801. Indeed, the issuance of an injunction in the present action can only serve to promote the public interest. While perhaps not strictly a part of the record, the Court will refer to the letter, which was filed with the Court by plaintiff's counsel, from the Director of the Securities Division, Bureau of Banking for the State of Maine. In this letter, the Director of the State agency charged with the responsibility for administering the Maine Takeover Law expresses the State's serious concern that the present transaction falls within the terms of that law and that the law has not been complied with.

In conclusion, the Court holds that plaintiff UV has demonstrated a violation of the Maine Takeover Law by defendant Sharon. UV has shown irreparable injury if an injunction does not issue outweighing any harm to Sharon if an injunction does issue, a clear likelihood of success on the merits, and the absence of an adverse effect on the public interest. The plaintiff's prayer for a preliminary injunction is granted. The defendant's objection to the granting of such an injunction is denied. The requested preliminary injunction will issue. Since plaintiff is concededly a Maine corporation with more than adequate financial resources, no security will be required, pursuant to F.R. Civ.P. 65(c).