**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Samuel F. D'ANNUNZIO, et al., Defendants.**

**Civ. A. No. 81–0012–C(H).**

United States District Court,
N. D. West Virginia,
Clarksburg Division.

Oct. 22, 1981.

Stephen G. Jory, U. S. Atty., Elkins, W. Va., Werner Goldman, Assistant Gen. Counsel, Washington, D. C., John C. Deal, Regional Counsel, Columbus, Ohio, for plaintiff.

Francis L. Warder, Louchery & Sinsel, Clarksburg, W. Va., for defendants.

## ORDER GRANTING PRELIMINARY AND PERMANENT INJUNCTION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

HADEN, District Judge.

This matter is before the Court on a motion for preliminary injunction for violation of the Change in Bank Control Act of 1978 ("CBCA"), Section 2[7](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1817(j).[1]

On March 16, 1981, the Plaintiff filed a Complaint for Preliminary and Permanent Injunction along with a Motion for Order to Show Cause. The relief sought by the Plaintiff included a preliminary injunction and final judgment enjoining the Defendants from voting or giving proxies to vote stock in West Union Bank, West Union, West Virginia ("West Union"), attending or voting at meetings of West Union's board of directors, acquiring additional stock in West Union, directing or attempting to direct the management or policies of West Union, and exercising control over West Union in any way. In addition, the Plaintiff requested a permanent injunction requiring that the Defendants reduce their ownership of stock in West Union to less than ten percent of the outstanding shares.

On April 8, 1981, the Plaintiff filed a motion for summary judgment. At the hearing on the motion for summary judgment, this Court determined that there was a genuine issue of material fact as to whether the Defendants were a group or had acted in concert, and denied the motion. The motion for preliminary injunction was then set down for an evidentiary hearing.

The Court having held an evidentiary hearing beginning on September 11, 1981, and continuing on September 16, 1981, on the Plaintiff's motion for preliminary injunction and having heard oral argument for all parties, and having stated oral findings in open Court on September 16, 1981, now incorporates its bench rulings into the following findings of fact and conclusions of law:

### Findings of Fact

The Plaintiff, Federal Deposit Insurance Corporation, is a corporation chartered under the laws of the United States and is an agency of the United States of America.

The individual Defendants are Samuel F. D'Annunzio, his son, Vincent F. D'Annunzio, R. O. Delaney, and Thomas F. Rokisky. Also named as Defendants are Coal Service Corporation, a corporation controlled by Delaney, The Lowndes Bank, a West Virginia banking corporation, and Halow & Co., the nominee of the trust department of The Lowndes Bank. Both Delaney and

---

1. Section 2[7](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1817(j), provides, in part, as follows:

   "(1) No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase assignment, transfer, pledge, or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition or extending for up to another thirty days the period during which such a disapproval may issue.

   \* \* \* \* \* \*

   (8) For the purposes of this subsection, the term—
   (A) "person" means an individual or a corporation, partnership, trust, association, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, or any other form of entity not specifically listed herein; and
   (B) "control" means the power, directly or indirectly, to direct the management or policies of an insured bank or to vote 25 per centum or more of any class or voting securities of an insured bank."

Samuel D'Annunzio are directors of The Lowndes Bank and Rokisky is an officer of The Lowndes Bank.

West Union is a West Virginia banking corporation that is not a member of the Federal Reserve System but is insured by the Federal Deposit Insurance Corporation.

Prior to December 15, 1980, Marsha Leggett was the owner of 5,300 shares of the capital stock of West Union, which represented 21.2 percent of the 25,000 shares of stock outstanding. As such, Marsha Leggett was West Union's largest shareholder. The next largest shareholder, Mr. and Mrs. Farr, owned 4,200 shares. On at least two occasions prior to December 15, 1980, Marsha Leggett, desirous of selling her stock in West Union, communicated with West Union regarding its value and marketability. On each such occasion she was advised that there was no market for the stock. At some point Marsha Leggett requested the assistance of her cousin, Donald F. Leggett, an employee of The Lowndes Bank, in finding a buyer or buyers for the stock.

Donald Leggett advised several of his acquaintances, including Delaney and Samuel D'Annunzio, of his cousin's desire to sell her stock. Negotiations for the purchase of the stock followed. On or about December 15, 1980, the negotiations resulted in the execution of an agreement between Marsha Leggett, as seller, and Delaney and Samuel D'Annunzio, as purchasers, calling for the sale of all of her stock. In partial consideration for this sale, Marsha Leggett later received two promissory notes, one from Samuel D'Annunzio and one from Coal Service Corporation, the latter executed by Delaney as president.

In late December, Samuel D'Annunzio telephoned Robert L. Holland, president of West Union, and arranged to meet with Holland. D'Annunzio arrived at the meeting (held on December 29, 1980) accompanied by Delaney, Rokisky, and Marsha Leggett's attorney, David Spelsburg. At the meeting, D'Annunzio expressed a desire to have Rokisky and Vincent D'Annunzio serve as directors of West Union. Holland informed those present that the bylaws of

the bank authorized a maximum of nine directors and that there were at that point eight incumbent directors. Holland also informed those present that the bank's bylaws required that each director be the owner of 250 shares of the bank's stock. Samuel D'Annunzio asked that 250 shares of the stock be registered in the name of Rokisky, 250 shares in the name of Vincent D'Annunzio, and 4,800 shares in the name of Halow & Co. representing the stock owned by Delaney and Samuel D'Annunzio. Spelsburg presented Holland with Marsha Leggett's stock certificate and also requested that it be reissued in the manner requested by Samuel D'Annunzio. The stock was registered accordingly.

A regular shareholders meeting of West Union was held on January 14, 1981. Carl O. Smith, Jr., trust officer of The Lowndes Bank, participated in the meeting along with Rokisky and Vincent D'Annunzio. Although Samuel D'Annunzio was present in another part of the bank, he did not participate in the meeting. At the meeting, it was moved by Smith and seconded by Rokisky that the bylaws of West Union be amended to increase the maximum size of the board of directors to ten members. This motion was carried without dissent. Following this amendment, ten persons were nominated to serve as directors, including Rokisky, Vincent D'Annunzio, and the eight incumbents. The slate of directors was elected without dissent. Rokisky and Vincent D'Annunzio each voted the 250 shares registered in his name and Smith voted the 4,800 shares registered in the name of Halow & Co. in favor of both the amendment of the bank's bylaws and the election of the slate directors. At the meeting of the board of directors of West Union held immediately following the adjournment of the shareholders meeting, Rokisky and Vincent D'Annunzio took their oaths of office as directors and were installed as such.

On January 16, 1981, being informed of the transfer of stock, and not having received a notice of acquisition of control, the Plaintiff informed Rokisky, Vincent D'An-

nunzio, and Smith that the transaction appeared to constitute a violation of the CBCA and asked that action be taken to resolve the matter at an early date. Smith, Rokisky, and Vincent D'Annunzio responded separately, each denying that there was a violation. By letters to Rokisky, Vincent D'Annunzio, and Smith dated February 10, 1981, the Plaintiff requested "appropriate action." Rokisky responded by denying that he had acted in concert. Smith responded by asking whether the transfer of 2,400 shares from the name of Halow & Co. into the name of Coal Service Corporation would be appropriate. The Plaintiff then wrote to Rokisky suggesting divestiture of the stock and to Smith stating that the transfer would not correct the violation. Following this exchange of letters, this action was brought.

### Conclusions of Law

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1345, and 1349 and Sections 2[7](j)

2. Section 2[3](q) of the Federal Deposit Insurance Act, 12 U.S.C. § 1813(q), provides in part, as follows:
   "The term 'appropriate Federal banking agency' shall mean—
   \* \* \* \* \* \*
   (3) the Federal Deposit Insurance Corporation in the case of a State nonmember insured Bank (except a District bank) or a foreign bank having an insured branch."

3. Section 2[7](j)(13) of the Federal Deposit Insurance Act, 12 U.S.C. § 1817(j)(13), provides:
   "The appropriate Federal banking agencies are authorized to issue rules and regulations to carry out this subsection."

4. Section 2[9] of the Federal Deposit Insurance Act, 12 U.S.C. § 1819, provides:
   "Upon June 16, 1933, the Corporation shall become a body corporate and as such shall have power—
   \* \* \* \* \* \*
   Tenth. To prescribe by its Board of Directors such rules and regulations as it may deem necessary to carry out the provisions of this Act or of any other law which it has the responsibility of administering or enforcing (except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to any other regulatory agency)."

and 2[9] of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1817(j) and 1819.

The Change in Bank Control Act of 1978, Section 2[7](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1817(j), requires that under certain circumstances where 25 percent of the outstanding shares of an insured bank are acquired or intended to be acquired that the FDIC, as to this particular type of financial institution,[2] be given a sixty day notice and that the FDIC then can take some action to disapprove the transaction within sixty days with the option of extending consideration for an additional thirty days.

Pursuant to specific rulemaking authority in the CBCA[3] and general rulemaking authority in Section 2[9] of the Federal Deposit Insurance Act,[4] the FDIC promulgated regulations which are found in 12 C.F.R. § 303.15. These regulations provide that, in addition to the situation where one acquires 25 percent ownership, one who acquires more than 10 percent ownership must give notice to FDIC, if either of two circumstances are satisfied.[5] One of those circum-

5. Section 303.15(a) of Title 12, C.F.R. provides, in part, as follows:
   "In addition, a purchase, assignment, transfer, pledge, or other disposition of voting stock through which any person will acquire ownership, control, or the power to vote ten percent or more of a class of voting securities of an insured State nonmember bank will be deemed to be an acquisition by such person of the power to direct that institution's management or policies if:
   (1) The institution has issued any class of securities subject to the registration requirements of section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 781); or
   (2) Immediately after the transaction no other person will own a greater proportion of that class of voting securities. Other transactions resulting in a person's control of less than 25 percent of a bank would not result in control for purposes of the Act. An acquiring person may request an opportunity to contest any presumption established by this paragraph (a) of this section with respect to a proposed transaction. The Corporation will afford the person an opportunity to present views in writing, or, where appropriate, orally before its designated representatives either at informal conference discussions or at informal presentations of evidence."

stances, not relevant in this case, is if the institution has issued any class of securities subject to the registration requirements of Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*. The second circumstance, the one that is in issue here, is that if immediately after the transaction no other person will own a greater proportion of that class of voting securities.

The assertions are that if the Court considers the D'Annunzio-Delaney purchase of the Leggett shares of stock intact, that will represent fifty-three hundred shares of stock, which is 21.2 percent of the total outstanding shares of West Union and will exceed the ownership of any other outstanding shareholder in West Union. The next largest block of ownership under the control of one person or group would be forty-two hundred shares in the name of the Farrs. Those facts appear to be uncontroverted and, thus, would invoke the statute and the regulations that we are considering here.

From all the evidence, it is apparent that there was no willful violation of the statute involved. If at all, a violation occurred through ignorance of the parties, counsel, financial institutions, and others, of the requirements of the CBCA and the regulations promulgated pursuant thereto. That was certainly the case through the acquisition phase from December of 1980 until mid-January of 1981.

After that period, in late January, by the evidence before me in the form of correspondence between the Plaintiff and Messrs. Rokisky, Vincent D'Annunzio, and Smith, it is quite apparent that FDIC wrote to the nominees or the appropriate parties and called their attention to the CBCA and the regulations. From that point forward the Defendants acknowledged the CBCA, but did not consider themselves to be in violation. This determination was made by the new shareholders or their representative.

The absence of willfulness, however, is not crucial nor even relevant to the resolution of this case. Instead, what is important is the power to control. All of the facts here, though susceptible to different inferences in different persons' minds, would clearly indicate to this Court that if "push came to shove" the fifty-three hundred shares of stock purchased by D'Annunzio and Delaney would have been voted intact. Holland and the other shareholders of West Union came to this realization and also came to the further realization of cumulative voting under West Virginia law.[6] Accordingly, they realized that the fifty-three hundred shares would reflect some degree of possible future control of West Union's policies and would, in all likelihood, result in the election of 20 percent of the West Union's board of directors. This conclusion is further manifested by what then occurred in expanding the size of the board of directors from eight to ten and in electing the two new members to the board of directors who were there to represent the interest of fifty-three hundred shares of stock.

I cannot, despite protestations to the contrary, find that control was exercised separately, that is, two hundred and fifty shares to Rokisky, two hundred and fifty shares to Vincent D'Annunzio and forty-eight hundred shares to Halow & Co. on behalf of D'Annunzio and Delaney. There was a potential cumulative exercise of control of 21.2 percent of the outstanding shares. And if it had been required, it would have been so voted and exercised meaningfully under the cumulative voting provisions.

Although it was inadvertent and nonwillful, I nonetheless conclude that the evidence indicates that a clear violation of the statute and the regulations occurred.

Defendants assert that the Plaintiff has made no showing of irreparable harm, and, if it has, the showing occurred wholly from the general underlying policy of the statute and its enforcement.

The Plaintiff argues that with respect to the requirements of assessing harm and using the balancing test which is recognized

---

**6.** *W.Va.Code*, §§ 31–1–93, 31A–4–1.

in the Fourth Circuit in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977), it is not necessary for the Court to assess and weigh the factor of irreparable harm because the Government, as Plaintiff in this type of case, is not put to the burden of showing irreparable harm, but only of demonstrating a violation of a federal statute. In support of this proposition, the Plaintiff cites *UV Industries, Inc. v. Posner*, 466 F.Supp. 1251 (D.C. Me.1979).[7] However, in a more recent Fourth Circuit case, *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980), the court passed upon the appropriateness of the issuance of an injunction to halt enforcement of the Virginia take-over statute, a similar statute as that in litigation in *UV Industries*. In *Telvest*, Judge Widener, speaking for the court, assessed the appropriateness of injunctive relief under the *Blackwelder* test:

"The district court is first to balance the likelihood of harm to the plaintiff if the temporary injunction is not issued against the likelihood of harm to the defendant if the temporary injunction is issued. If the harm to the plaintiff greatly outweighs the harm to the defendant, then enough of a showing has been made to permit the issuance of an injunction, and plaintiff need not show a likelihood of success on the merits, for a grave or serious question is sufficient. But as the balance of the harm to the plaintiff decreases, when balanced against the harm to the defendant, the likelihood of success on the merits becomes important."

618 F.2d at 1032–1033. As the Fourth Circuit noted in the *Blackwelder* case, where the balance of hardship stands at equipoise, the probability of success on the merits begins to assume real significance. 550 F.2d at 195, n. 3.

■ I am, therefore, bound to make my appraisal of the right to relief based upon the standards of the *Blackwelder* case and, as well the more recent Fourth Circuit case, *Federal Leasing v. Underwriters at Lloyd's*, 650 F.2d 495 (4th Cir. 1981), which also follows *Blackwelder*.

Using the *Blackwelder* standards, the Court finds that there will be irreparable harm occurring to the Plaintiff if the injunction is not granted in this case because it has been demonstrated that there was a clear violation of the statute, a very recently enacted statute, and of the regulations promulgated pursuant to that statute. This statute represents the will of Congress and comprises part of the charge imposed by the law upon this administrative agency, the FDIC, to regulate financial institutions throughout the United States subject to its regulations.

I further note this is only the third case in which the Change in Bank Control Act of 1978, has been given some consideration by litigants and by courts.[8] There is no case on point to the issue raised here, and this, apparently, will be the first such case to pass upon the mechanism of enforcement of the sixty day notice requirement by a federal banking agency.

■ The FDIC, as a federal agency with limited resources, must be very careful about how it goes about enforcing its statute and must do it in the most economical manner possible. It has also been suggested that the Court ought to be aware of its resources and judicial economies, as well, and use the most efficacious remedy, while also seeing that federal regulatory statutes are given due recognition. The injunctive process is the most efficacious way to ac-

---

7. The district court in *UV Industries* acknowledged that the First Circuit's test required that irreparable harm be proved, but stated that this requirement did not apply where the statute provided for injunctive relief. 466 F.Supp. at 1255. The *UV Industries* court alternatively found irreparable harm. *Id.* at 1256.

8. *First Alabama Bancshares, Inc. v. Lowder*, No. CV 81–M–0325 (N.D.Ala. May 1, 1981),

held that there is a private right of action for injunctive relief where the CBCA is violated. *Flagship Banks, Inc. v. Smathers*, No. 81–713–Civ–EPS (S.D.Fla. July 22, 1981), held that there is no private right of action. *Riggs National Bank v. Allbritton*, 516 F.Supp. 164 (D.C. D.C.1981), dealt indirectly with the CBCA and did not rule on the issue of injunctive relief for violation of CBCA.

complish compliance. Further, it would be wholly inappropriate to force the FDIC and these Defendants to an administrative proceeding where a civil penalty is the remedy.[9] A ten thousand dollar a day fine is inappropriate because it does not appear that anyone was acting willfully, in blatant disregard of the law with a view of evading or avoiding its provisions. On the other hand, it does appear from an injunctive standpoint that once the Defendants became aware of the facts and the requirements of the CBCA in February, 1981, and then persisted in their refusal to recognize the FDIC's capacity to administratively enforce the statute, the resulting situation must now be remedied by this Court by issuance of an injunction.

Assessing these factors, I find that under the circumstances in this case, there would be greater harm to the Plaintiff if the preliminary relief would be denied than there would be to the Defendants if the preliminary relief would be granted.

Having heard almost all of the evidence that could have been presented if there were to be a full trial, the Court finds, based upon the evidence I have heard and knowing that the people who testified here appear to be credible individuals on both ∴des, that there would be a high degree of probability that the FDIC as Plaintiff would prevail on the substantive point that there has been a violation of the notice requirement of the statute.[10]

The public interest in the matter has been recently declared by the United States Congress in the legislative intent underlying and formulating the enactment of the Change in Bank Control Act of 1978. Although the parties to the transaction might have a different idea of the need for such a law, the majority of Congress has spoken and that is the law. The public interest lies in upholding the law.[11]

### Order

Considering all those matters, and in view of the facts in this case, appropriate relief will bring the Defendants into compliance with the law in a manner that will hurt them least and yet preserve and give due recognition to the right of the Plaintiff to see that the statute is enforced. NOW, THEREFORE, IT IS ORDERED:

The Defendants are enjoined in their respective capacities, and in their functions as shareholders and directors from voting or giving proxies to vote West Union Bank stock; attending or voting at meetings of West Union Bank's board of directors; acquiring additional stock in the West Union Bank; directing or attempting to direct the management or policies of West Union Bank, to the extent of control that I previously have found is apparent here; and exercising control over the operations of the bank in any way.

---

**9.** Civil penalties are provided in 12 U.S.C. § 1817(j)(15):

"Any person who willfully violates any provision of this subsection, or any regulation or order issued by the appropriate Federal banking agency pursuant thereto, shall forfeit and pay a civil penalty of not more than $10,000 per day for each day during which such violation continues. The appropriate Federal banking agency shall have authority to assess such a civil penalty, after giving notice and an opportunity to the person to submit data, views, and arguments, and after giving due consideration to the appropriateness of the penalty with respect to the size of financial resources and good faith of the person charged, the gravity of the violation, and any data, views, and arguments submitted. The agency may collect such civil penalty by agreement with the person or by bringing an action in the appropriate United States dis-

trict court, except that in any such action, the person against whom the penalty has been assessed shall have a right to trial de novo."

**10.** As to any remaining legal questions, *Auto Drive-Away Co. of Hialeah, Inc. v. ICC*, 360 F.2d 446 (5th Cir. 1966) and *U. S. v. Byrd*, 609 F.2d 1204 (7th Cir. 1979) also indicate a high degree of probability that the FDIC as Plaintiff would prevail on the issue of relief for such violation.

**11.** As the *Blackwelder* court noted:

"The presence of a federal statute both prohibiting the alleged acts of the defendant and supplying the gravamen of the complaint aligns [the plaintiff], if only provisionally, on the side of the public interest and constitutes added weight in favor of precautionary relief." 550 F.2d at 197.

This injunction shall be in effect until such time as the group represented here as Defendants, owning or having the right to vote fifty-three hundred shares of stock in the West Union Bank, divest themselves of eleven hundred and one shares of that stock, thus making their retained ownership in the bank not more than forty-one hundred and ninety-nine shares, or one share less than the Farr group, and thus bringing this group into compliance with the law relieving them from the notice requirements of the regulation and statute.[12]

---

12. This case involves the presumption of control under 12 C.F.R. § 303.15. Accordingly, it is not necessary to decide, and I do not decide, what relief would be appropriate if the group had acquired 25 percent or more of West Union's stock.