CITIZENS FIRST BANCORP, INC., et al., Plaintiffs,

v.

W. Grady HARRELD, Jr., et al., Defendants.

No. C 82–0247–O(B).

United States District Court, W.D. Kentucky, Owensboro Division.

Nov. 8, 1982.

M. Kirby Gordon, II, Owensboro, Ky., R. Van Young, Louisville, Ky., for plaintiffs.

George S. Wilson, III, Owensboro, Ky., James S. Welch, William D. Lambert, Louisville, Ky., for defendants.

## MEMORANDUM

BALLANTINE, District Judge.

This action involves the internecine conflict between two factions of the Board of Directors for control of a bank.

Plaintiff, Citizens First Bancorp, Inc. (Bancorp), is a bank holding company which owns all of the 400,000 shares of Citizens State Bank of Owensboro, Kentucky (Bank). The establishment of Bancorp was handled by Mr. Brooks Senn, a Louisville attorney recognized as an eminent authority on banking law.

The individual plaintiffs are directors and shareholders of Bancorp. Plaintiff Hoptry is President and Chief Executive Officer of Bancorp and the Bank. Plaintiff Johnson is Secretary of Bancorp and Senior Vice President of the Bank. Defendants are shareholders and directors of Bancorp. Defendant Yager is Vice-Chairman of the Board of Bancorp and, until the commencement of this action, defendant Wilson was general counsel of Bancorp.

Bancorp became a registered bank holding company on August 5, 1982, when it acquired the outstanding stock of the Bank. Bancorp issued 400,000 shares of its stock to about 580 shareholders. The stock is publicly traded over the counter.

In late June or early July, 1982, it became common knowledge in Owensboro that Tennessee banking entrepreneur, C.H. Butcher, had bought the Central Bank and Trust Company of Owensboro. This information triggered a flurry of activity on the part of all of the parties to this litigation.

On July 1, 1982, defendant Wilson asked Hoptry to furnish him data showing the stock ownership of the directors and their families. The next day defendant Wilson requested a list of shareholders.

On July 2, 1982, defendant Yager purchased 3000 shares of Bank stock, increasing his ownership to 11,000 shares.

On July 9, 1982, Howard Sanders, Vice-President and Comptroller of the Bank delivered to defendant Wilson reports and documents which the Bank had filed with various regulatory agencies along with a description of the Bank's investment portfolio. He also gave defendant Wilson information concerning present and projected earnings, as well as a budget analysis. Defendant Wilson delivered this information to Citizens Fidelity Corporation, a Louisville bank holding company.

On July 12, 1982, defendant Wilson met with Leonard James, an Owensboro insurance executive and Lawrence Pedley, a Louisville attorney. The next day Pedley wrote to defendant Wilson advising him that his, Pedley's, group would be in touch with defendant Wilson after meeting with their accountants. Defendant Wilson kept his co-defendants informed of his activity but did not share this information with plaintiffs.

On July 13, 1982, Citizens Fidelity returned the information which defendant Wilson had furnished. On July 19, 1982, Michael Harreld, Senior Vice-President, and J. David Grissom, Chief Executive Officer of Citizens Fidelity, met with defendants (except Thompson) in defendant Wilson's office.

We believe it is appropriate at this point to note that it is common knowledge that some of Kentucky's largest banking concerns are avidly pursuing the enactment of legislation which would authorize the establishment of multi-county bank holding companies which is presently prohibited.

The evidence at trial would support the conclusion that Citizens Fidelity is interested in procuring an option to purchase Bancorp in the event the legislation mentioned in the preceding paragraph should be enacted.

On July 26, 1982, Pedley contacted defendant Wilson and informed him that the Pedley group would be in touch with the defendants after the Bancorp holding company was finally formed.

At a special Board meeting held August 3, 1982, at which Senn was present, defendant Wilson disclosed to the Board that the Pedley group, which included Leonard James, had offered to purchase the di-

rectors' stock. There had also been some activity by the Board members and their families in purchasing stock in the Bank and in Bancorp after the holding company had been formed.

On August 9, 1982, James, on behalf of the Pedley group, delivered an offer to Yager by which they proposed to purchase the directors' stock and the stock of the Crescent Company, a Tennessee corporation which, for all intents and purposes, was controlled by D.W. Johnston. Crescent owned just less than 25% of the stock of Bancorp. (The offer, apparently through inadvertence, omitted the defendant Wilson.) The shares owned by the offerees totalled about 208,000. The offered price was $58.63 per share and would be paid by an as yet unformed bank holding company. The remaining shares would be exchanged on the basis of ½ share of stock in the new company and a $20.00, 11%, 10-year debenture for one share of Bancorp stock. The directors and Crescent would have received slightly over $11,000,000 for their stock while the remaining stockholders, representing 48% of the shares, would have received substantially less, probably about $2,500,000 to $3,000,000 over a 10-year period.

Yager communicated the offer at the Board meeting of August 10, 1982, and after what appears to have been a stormy session, it was decided to let the offer expire.

On August 24, 1982, Yager delivered a second offer from the Pedley group by which the stock of Crescent, the directors and their families—about 238,000 shares—would be purchased for $62.10 per share and no provision was made for the remaining shares. No action on this offer was taken at the August 24 meeting and a special meeting of the Board was called for August 30, 1982, the date on which the offer would expire.

During the August 24 meeting the directors were informed that Wallace Wilkinson of Lexington was on the telephone expressing an interest in purchasing Bancorp's stock. Defendant Yager directed plaintiffs Hoptry and Johnson to visit Wilkinson in Lexington the next day and deliver to him information similar to that which the defendant Wilson had delivered to Citizens Fidelity.

The next day plaintiffs Hoptry and Johnson, along with Sanders, tried to call Wilkinson to alert him to their proposed visit. Even though they failed to reach Wilkinson, they nevertheless set out for Lexington by way of Louisville. In Louisville Hoptry, Johnson and Sanders stopped at First National Bank of Louisville (FNB) where they met William Rue, an executive of the bank. The ostensible purpose of the meeting was to inquire into the possibility of finding a party who or which might be interested in making a tender offer for all of the Bancorp stock. At Rue's suggestion, they all went to the offices of Greenebaum, Doll and McDonald, attorneys, where they met with Mr. Ivan Diamond, a member of the firm. In Diamond's office the Owensboro men were soon joined by several representatives of FNB.

The meeting in Diamond's office, which lasted into the late evening, resulted in the development of a plan by which Bancorp would buy back about 75% of its outstanding stock. Financing for this plan would be in the form of a $15,000,000 loan from FNB, security for which would be a pledge of the stock of Bancorp which was redeemed. About the terms of the loan more will be said later. Hoptry testified that during the meeting in Diamond's office repeated unsuccessful attempts were made to reach Wilkinson and after the meeting Hoptry, Johnson and Sanders returned to Owensboro.

On August 27 a special Board meeting of Bancorp was held. Diamond and Thomas Lawrence of FNB explained the proposal. The terms of the loan commitment provided that FNB would lend Bancorp $15,000,000 to redeem 300,000 shares of its outstanding stock which would be pledged as security on the loan. The note was for a term of one year, renewable at the option of FNB. In-

terest was at the rate of ½% above FNB's prime rate.[1]

Defendants were something less than enthusiastic about FNB's proposal and Diamond and Lawrence left the meeting, taking the loan commitment with them back to Louisville.

On August 30 another special Board meeting was held. After discussion it was agreed that the second offer by the Pedley group was unacceptable—whether as Johnston said because it had too many escape hatches or because it carried with it a threat of litigation by the minority stockholders who would be left holding a very insubstantial and empty bag, is of no great significance. It is sufficient to note that no action was taken. By the August 30 meeting the battlelines between plaintiffs and defendants were clearly drawn. Both factions were conducting cabalistic meetings at which strategies were developed.

On September 17, a Friday, 5 of the plaintiffs went to Louisville where they met with representatives of FNB in the offices of Greenebaum, Doll and McDonald. FNB, with slight modification, renewed its loan commitment for $15,000,000. This commitment letter was sent to Hoptry Monday, September 20.

On September 21, at a regular meeting of the Bancorp Board, a resolution was proposed by which Bancorp would purchase up to 300,000 of its outstanding shares at no more than $50.00 per share to be financed by accepting FNB's commitment letter. Plaintiffs (except for Johnson who was not at that time a director) voted for the resolution and defendants voted against it.

After the meeting adjourned defendants met in defendant Wilson's office. Johnston was contacted at his Nashville address and advised to come to Owensboro, which he did on September 22.

On the evening of September 21, defendant Wilson's law firm prepared proxy forms, including one for Johnston to execute on behalf of Crescent. A Notice of Special Stockholders' Meeting was prepared and signed by all defendants and by Johnston on behalf of Crescent. The shares owned by the signers of the notice totalled over 176,000. The stated purposes of the meeting were the removal of all directors of Bancorp, amendment of the by-laws to provide for the election of not less than 7 nor more than 18 directors, determination of the number of directors to be elected to serve until the next annual meeting and, finally, to nominate and elect those directors.

On September 22 defendants Wilson and Mitchell went to the Bank's office and, in substance, demanded Hoptry's resignation. During the confrontation Mitchell apparently represented to Hoptry that defendants controlled in person or by proxy over 50% of the outstanding stock of Bancorp.

It is now conceded that the proxies obtained by defendants were invalid and of no force.

On September 23 plaintiffs met to discuss the resignation demand and concluded that none of them would resign. Conciliatory efforts were undertaken with Johnston but terminated when counsel for defendants delivered the notice of special shareholders meeting to the plaintiff Hoptry.

This action was commenced on October 1, 1982, and a temporary restraining order was entered October 4, 1982, enjoining the special shareholders meeting.

Plaintiffs seek a preliminary injunction which would declare all proxies obtained by defendants in late September invalid and would prevent defendants from calling a special stockholder's meeting for 45 days from the date of entry. The tendered order

1. At the hearing on the application for a temporary restraining order and again at trial, it was developed that the Bank's net worth is in the neighborhood of $14,000,000 and that its 1981 income was about $3,000,000.

While there was evidence that FNB's projections established that Bancorp could retire the debt, the Court speculates with a certain degree of fascination on whether FNB would renew the loan in the event of passage of the Multi-county Banking Act by the General Assembly of Kentucky.

would also have this Court enjoin defendants to abide by various provisions of the federal securities laws. Under *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir.1977), we must make four findings in order to issue the preliminary injunction.

(1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiffs have shown irreparable injury;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

Plaintiffs first argue that the solicitation of proxies by the defendants was violative of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78n(a). Defendants admit that proxies were granted and that no proxy statement was filed with the Securities and Exchange Commission. Defendants would have this Court believe that the proxies were never solicited but were the result of coincidental face-to-face contact or that they were contacted by shareholders who wished to give them proxies. Defendants further assert that they assiduously avoided use of any instrumentality of interstate commerce.

■ However that may be, we believe the conversations leading to Mr. D.W. Johnston's trip to Owensboro from Nashville, Tennessee on September 22, 1982, were interstate and, obviously, the telephone is an instrumentality of interstate commerce. This conversation and several others mentioned in the testimony were at minimum "... other communication to security holders under the circumstances reasonably calculated to result in the procurement ... of a proxy." 17 C.F.R. Section 240.14a–1(f)(iii).

All of this may seem somewhat academic since defendants have agreed not to use any of the proxies or solicit others in reference to the meeting they wish to call. However,

we believe it very probable that plaintiffs could, if they have not already done so, prevail on the merits of this claim. That harm will be suffered by plaintiffs and other shareholders unless the proper form of solicitation is used and that the public interest would be served by using the proper form is the very basis of the federal laws governing the use of proxies. That defendants will not be harmed by this Court's admonition not to change their minds is borne out by their agreement not to use these proxies or to solicit others without compliance with the law.

■ It is also argued that plaintiffs' 13(d) question is academic since the defendants filed a 13(d) disclosure on October 4, 1982. We have little difficulty concluding from the evidence presented at the hearing that there is a substantial likelihood that plaintiffs could prevail on their allegations that the defendants have formed a group at least for the purpose of calling the special stockholders meeting and voting their shares together in an attempt to remove various members of the current Board of Directors of Bancorp. It would require a degree of naivete unbecoming to this Court to believe that the various activities of defendants were not the product of an agreement among the group but, rather, were merely coincidences.

■ Such an agreement would bring defendants within the definition of Rule 13d–5(b)(1), 17 C.F.R. Section 240.13d–5, because agreeing to hold or vote the shares together constitutes beneficial ownership for the purposes of Section 13(d) of the 1934 Act. This, however, is the easy part. Plaintiffs further argue that the Schedule 13D subsequently filed by defendants is false and misleading in several aspects.

It is settled that the filing requirements of Section 13(d) mandate completely truthful statements. *S.E.C. v. Savoy Industries, supra,* at [paragraph] 93,871. Nevertheless, the Williams Act is clearly not designed as armament for incumbent management, *Rondeau v. Mosinee Paper Co., supra,* 422 U.S. [49] at 58–59, 95 S.Ct. 2069 [45 L.Ed.2d 12]; *Piper v. Chris-*

*Craft, supra* [430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124] and more than a technical violation of 13(d) requirements must be shown. *Universal Container Corp. v. Horwitz* [1977–78] C.C.H. Fed.Sec.L.Rep. Paragraph 96,161 (S.D.N.Y.1977) (Conner, J.); *Scott v. Multi-Amp Corp., supra* [386 F.Supp. 44 (D.N.J.1974) ].

*Wellman v. Dickinson,* 475 F.Supp. 783, 833 (S.D.N.Y.1977), *aff'd without opinion,* 647 F.2d 163 (2d Cir.1981). *See also, Wellman v. Dickinson,* 497 F.Supp. 824 (S.D.N.Y. 1980), *aff'd.,* 682 F.2d 355 (2d Cir.1982).

The major question about the Schedule 13D filed by defendants relates to their alleged agreement to remove the present management of Bancorp. There was testimony at the hearing that the removal of plaintiffs Hoptry and Johnson was a condition to be met before defendants would abandon their call for a special stockholder's meeting. However, this does not appear to have been the major objective of the defendants. That they would likely have the authority and power to do so if they wished is obvious to anyone reading the 13D they did tender. We believe that this is the substance of any agreement or arrangement that may have been formed by defendants. That defendants and D.W. Johnston together controlled some 43% of the Bancorp stock and were prepared to remove the entire group of directors, possibly amend the by-laws to provide for a seven-member board and each run for a seat on that board is spelled out in the 13D filed. If they succeeded at that, there might be little need to remove management; they would be in control anyway, could defeat the "Citizens plan" and proceed with whatever other projects they deemed appealing.

Plaintiffs' other argument about the 13D is that defendants still deny the existence of a group. Such a disclaimer is specifically allowed by the instructions under Section 240.13d–7. While we have found substantial likelihood that plaintiffs would prevail on the issue of group status, we believe that defendants may in good faith argue the contrary until such time as we make a finding on the issue.

We therefore conclude that there is a substantial likelihood that plaintiffs would prevail on the issue of group status of the defendants. However, we find no irreparable harm running to plaintiffs at this time because defendants and Johnston have filed a Schedule 13D which substantially complies with the S.E.C. rules. We will therefore deny plaintiffs' prayer for injunctive relief on this issue.

Plaintiffs also argue that the defendants have violated the provisions of the Change in Bank Control Act of 1978, 12 U.S.C. Section 1817(j) by failing to give the appropriate federal banking agencies sixty days notice prior to obtaining control over Bancorp. The statute reads in pertinent part:

(j)(1) No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through the purchase, assignment, transfer, pledge or other disposition of voting stock of such insured bank. . . .

Plaintiffs argue that the operative word in this statute is "control". We disagree. We believe the key word is "through." According to the statute, the control must be acquired "*through* a purchase, assignment, transfer, pledge, or other disposition." Although it may seem a simplistic approach to plaintiffs' argument, we agree with defendants that whatever control defendants have, they have had prior to events now in question and that it has not been acquired through purchase, assignment, transfer, pledge, or other disposition. While there may have been an agreement for purposes of the securities laws, we decline the invitation to read such broad concepts into this statute. *Federal Deposit Ins. Corp. v. D'Annunzio,* 524 F.Supp. 694 (N.D.W.Va. 1981) and *Riggs National Bank of Washington, D.C. v. Allbritton,* 516 F.Supp. 164 (D.D.C.1981), are not to the contrary.[2] Both cases involve large purchases of stock immediately prior to suits alleging violation

2. The parties are reminded of Local Rule 8(e) of this Court.

of the Act. We are therefore of the opinion that the plaintiffs have shown no likelihood of success on the merits of this contention and injunctive relief under the Change in Bank Control Act will be denied.

■ Plaintiff finally seeks an order enjoining defendants from calling a special stockholders' meeting for forty-five days so that an information statement pursuant to Title 15 U.S.C. Section 78n(c), Section 14(c) of the Exchange Act, can be filed and disseminated. While we believe this statute unwittingly plays into the hands of management in this instance, we are reminded that the principle objective of the federal securities laws is the dissemination of information and not oversight of corporate politics. The statute, the legislative history (1964 U.S.Code Congressional and Administrative News, p. 3013, 3033–3034), and the cases which discuss Section 14(c) [*Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 383 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Peterson v. Federated Development Co.*, 416 F.Supp. 466, 476 (S.D.N.Y.1976)], make no distinction between other meetings called by management and other meetings called by others. While the information statement may be of a limited nature since the defendants assert that they will not request inclusion of their proposal in it, see Title 17 C.F.R. Section 240.14c–101, it will still have to be sent to shareholders. We will therefore enjoin defendants from noticing a special meeting for forty-five days from the date of this order.

■ Defendants seek injunctive relief as well. They assert that plaintiffs should also file a Schedule 13D of their own. Of considerably more importance to the continuing warfare, defendants seek an injunction preventing plaintiffs from carrying out the Citizen's plan. We decline to grant this injunction. It seems highly unlikely that plaintiffs would be able to bring the loan agreement and tender offer to fruition before the end of the forty-five day period before which no special shareholders' meeting can be held, if such actions are taken in accordance with the rules of the Securities and Exchange Commission and the Federal Reserve Board. If the force of law and the loan agreement with First National were not sufficient to guarantee the most scrupulous compliance on the part of plaintiffs, we have no doubt that defendants will be nothing less than single-minded in bringing any conceivable violations to the attention of this Court.

We conclude by reminding the parties to this action that the role of this Court in a case such as this is to ensure the dissemination of information to shareholders so that they may make informed decisions leading to the exercise of their corporate suffrage. We are also charged with ensuring that all parties comply with applicable federal laws. We are not here to protect management from hostile directors, nor are we empowered to decide the fairness or desirability of any plan or scheme any group may attempt. These are roles for properly informed shareholders. We will do all in our power to guarantee that our exercise of the first two functions allows proper exercise by shareholders of the second two. Further we will not go.

The foregoing recitation constitutes the Court's findings of fact and conclusions of law. F.R.Civ.P. 52.

An appropriate order has been entered this 8th day of November, 1982.

## PRELIMINARY INJUNCTION

Citizens First Bancorp, Inc. ("Bancorp") and the various individuals named as plaintiffs, both in their individual capacities and as officers, directors and shareholders of Bancorp, having moved this Court for a preliminary injunction, and the defendants having moved this Court for a preliminary injunction, the Court having considered both motions, the testimony and evidence offered at the hearing on both motions on October 12 and 13, 1982, and the Court being otherwise duly and sufficiently advised;

IT IS ORDERED AND ADJUDGED that defendants' motion for preliminary injunction be and is hereby denied in all respects, and

IT IS FURTHER ORDERED AND ADJUDGED that all proxies solicited by de-

fendants from Bancorp shareholders in September, 1982, and purporting to be valid through March 1, 1983, are hereby declared invalid for any and all purposes and shall not be used by defendants, their agents and representatives or any other person for calling a shareholders meeting, voting at any shareholders meeting or any other purpose whatsoever from the date of this Order, and

IT IS FURTHER ORDERED AND ADJUDGED that all future proxy solicitations with respect to Bancorp stock shall be conducted in accordance with Section 14(a) of the 1934 Act, 15 U.S.C. Section 78n(a), and the rules and regulations promulgated thereunder by the SEC, and

IT IS FURTHER ORDERED AND ADJUDGED that defendants are enjoined and restrained from calling a special meeting of the shareholders of Bancorp sooner than 45 days from the entry of this Order. Such delay is necessary to provide plaintiffs adequate opportunity to comply with all relevant provisions of the 1934 Act regarding the required dissemination of material information to shareholders prior to any shareholders meeting.

This preliminary injunction shall remain in effect until further order of this Court or until a final judgment is entered herein.