Joellen STANTON, of Brunswick, Cumberland County, Maine, By and Through her next friends, William A. and Marjorie L. STANTON, Plaintiff,

v.

BRUNSWICK SCHOOL DEPARTMENT, Brunswick School Board, Daniel Calderwood, and Gerald Millett, of Brunswick, Cumberland County, Maine, Defendants.

Civ. No. 83–0464 P.

United States District Court, D. Maine.

Jan. 23, 1984.

Robert Edmond Mittel, Michael P. Asen, Mittel & Hefferan, Portland, Me., for plaintiff.

Merton G. Henry, Nicholas S. Nadzo, Margaret S. Akar, Jensen, Baird, Gardner & Henry, Portland, Me., for defendants.

GENE CARTER, District Judge.

## I. PROCEDURAL BACKGROUND AND FACTS

This is a civil action in which the Plaintiff seeks injunctive relief and damages for the Defendants' refusal to publish in the 1984 Brunswick High School Yearbook a quotation which the Plaintiff had previously selected for inclusion in the yearbook. The quotation selected for publication by the Plaintiff from the January 24, 1983, issue of *Time* magazine, reads as follows:

> The executioner will pull this lever four times. Each time 2000 volts will course through your body, making your eyeballs first bulge, then burst, and then broiling your brains....

It is contended by Plaintiff that representatives of the Defendant Brunswick School Board, which is charged under state law (20 M.R.S.A. § 1011) to exercise overall responsibility for the operation of the Brunswick School Department, have, acting pursuant to their legal authority, refused to permit the inclusion of the selected quotation in the 1984 Brunswick High School Yearbook. Plaintiff brings her cause of action pursuant to the First Amendment of the United States Constitution, 42 U.S.C. § 1983, and 28 U.S.C. § 1343(3).

Plaintiff filed a motion with the original complaint seeking entry of a temporary restraining order "requiring defendants to forward to the publisher her yearbook information form; and to otherwise insure

that, pending trial on the merits, Plaintiff's quotation will appear in the 1984 school yearbook." The Court having declined to act on said motion *ex parte*, and notice having been given to the Defendants and a hearing held, the Court treats the motion as one for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). *Dilworth v. Riner*, 343 F.2d 226, 229 (5th Cir.1965).

The allegations in the original complaint [1] set forth the following facts in support of the application for relief. For the last ten years, approximately, the Defendants have published the High School Yearbook at the conclusion of each school year. Complaint, at ¶ 14. The yearbook has contained a section in which pictures of all of the members of the senior class appear together with biographical information about each student and a short quotation selected for inclusion by each student. *Id.* In years prior to 1984, it is alleged, there has existed no articulated policy, either written or oral, regulating the contents of the quotations selected by students for inclusion in the yearbook. Id. at ¶ 5. In the last several years student quotations have appeared in the yearbook encouraging the use of unlawful drugs and alcohol, and student quotations also have appeared in the yearbook from various "rock and roll" artists, some of whom speak in negative terms about traditional American values and promulgate statements which glorify sexual activity. *Id.* at ¶ 6. In addition, quotations reflect the views of such diverse individuals as John F. Kennedy and Bertolt Brecht. *Id.* Plaintiff claims that this utilization of the annual high school yearbook constitutes that publication, for First Amendment purposes, "a public forum." *Id.* at ¶ 7.

On or about November 1, 1983, Brunswick High School senior students were required to turn in information forms providing to the yearbook staff the biographical information to be included in the yearbook, as well as the individual student's selected quotation. *Id.* at ¶ 10. The Plaintiff returned such an information form. *Id.* The

Plaintiff's designated quotation was indicated on the information form. Plaintiff chose this quotation "because she wanted to draw people's attention to the horror of both murder and what she believed to be, on occasion, an appropriate punishment for it." *Id.* at ¶ 11. Plaintiff was thereafter requested in meetings with two faculty members, Sharon Bumgardner and Nancy Moore, to change her selected quotation. *Id.* at ¶ 12. Plaintiff indicated that she did not wish to do so. She then met with the Defendant Millett, the principal of the high school, who also attempted to persuade her to change her quotation. Again, she declined to do so. Defendant Millett then indicated to her that the quotation would not be used and could not be published in the yearbook. *Id.* The reason for the rejection of the quotation for publication given by the faculty members and the Defendant Millett was "that the quotation was too graphic and was unacceptable for public consumption.... [T]he quotation could not be printed because it would be 'disruptive to the community.'" *Id.* at ¶ 13. In answer to her inquiry, Plaintiff was informed that the yearbook was published by the school "and the school could decide what goes in and what doesn't." *Id.* at ¶ 14. Defendants continue to refuse to accept the Plaintiff's designated quotation for publication in the 1984 edition of the yearbook. *Id.* at ¶ 15.

The Plaintiff asserts that these actions of the Defendants have been conducted "under color of state law." *Id.* at ¶ 16. Additionally, it is asserted that for some of the allegedly wrongful conduct of the Defendants "plaintiff has no adequate remedy at law." *Id.* at ¶ 17. The yearbooks will not actually be distributed until April or May of 1984, but the immediacy of publishing deadlines is asserted to be a cause for the granting of immediate relief. *Id.* at ¶ 18. Such relief is claimed to be necessary in order to secure the publication of the Plaintiff's designated quotation in the event that this Court shall determine under

---

**1.** "Defendants' conduct violates Plaintiff's right to have access to a public forum for the asser-

tion of her views, whether those views are political or not." Complaint, at ¶ 19.

the Fourteenth Amendment and 42 U.S.C. § 1983 that Plaintiff may not be denied the opportunity to have the designated quotation published in the yearbook. *Id.*

The Defendants have submitted a number of affidavits in opposition to the granting of temporary injunctive relief. The first of these is that of Audrey Harlow, a senior at Brunswick High School, who serves as editor-in-chief for the 1984 Brunswick High School Yearbook. In that position she exercises overall responsibility for publication of the yearbook in conjunction with other editors, staff, and two faculty advisors. She confirms the information provided in the Plaintiff's complaint as to categories of information that are published in the senior section of the yearbook. She states that after receiving the information forms from the seniors, those forms were reviewed by Mrs. Bumgardner, one of the faculty advisors, and herself. She also asserts that "it is the policy of the yearbook staff that the materials published in the yearbook be tasteful and appropriate for all students and people in the community in 1984 and in future years." Harlow affidavit ¶ 5. The activity form filled out by the Plaintiff was initially reviewed by Mrs. Bumgardner, who sought Ms. Harlow's judgment as to whether "the quote selected by [the Plaintiff] should be accepted for inclusion in the yearbook." *Id.* at ¶ 6. Ms. Harlow states: "After reading the quote, I felt strongly and still feel strongly that the wording of the quote is not appropriate for the yearbook and agreed that it should not be approved. I would approve a statement either for or against the concept of capital punishment, if the wording were appropriate for the yearbook." *Id.* at ¶ 6.

Defendants have also submitted an affidavit of Sandra Bumgardner in which she states that she is one of two faculty advisors for the 1984 Brunswick High School Yearbook, with duties which "include reviewing of material to be published, assisting the editors in insuring that publishing deadlines are met, and helping with typing." Mrs. Bumgardner indicates that she was advised by J. Guy Levesque, a faculty advisor for prior yearbooks, and Defendant

Millett, the principal of Brunswick High School, "that in prior years a policy has been established and followed that excluded material which involved alcohol, sex or drugs or was distasteful or inappropriate for a Brunswick High School Yearbook." Bumgardner affidavit at ¶ 3. She states that she subsequently explained this policy to the senior section editors of the 1984 yearbook staff and indicated that this same policy would govern material for the 1984 yearbook. Those senior section editors agreed that Emily Moll "would speak to the senior class assembly on September 13, 1983, and set forth these guidelines for completion of the activity sheets." *Id.* at ¶ 3. Mrs. Bumgardner's affidavit further states that the information sheets were distributed to seniors on Monday, September 26, 1983.

Although the deadline for return of the sheets was October 14, 1983, some of the sheets were not returned until the end of October or early November. Upon their return she states that she reviewed the information sheets initially "to insure that they were properly completed and were acceptable to the yearbook." *Id.* at ¶ 6. Mrs. Bumgardner also states that upon review of the Plaintiff's information sheet, "I concluded that the quote which she requested was inappropriate since it was in poor taste." *Id.* at ¶ 7. She thereafter spoke with Plaintiff and suggested that the selected quotation be changed or that Plaintiff provide a substitute for it. Upon Plaintiff's refusal to accept that suggestion, Mrs. Bumgardner reviewed the designated quote with the other faculty advisor and with Ms. Harlow, the editor-in-chief of the yearbook, and with one Stephanie Smith, the senior section editor. She states that all of them agreed that the quote "was inappropriate and should not be included in the yearbook." *Id.* Mrs. Bumgardner then took the matter up with the assistant principal, Mr. Fairbrother, who also agreed that "the quote was inappropriate." *Id.* On November 3, 1983, she told the Plaintiff that it was the conclusion of the yearbook staff that the designated quotation "should not be in the yearbook." *Id.* at ¶ 8. She

indicates that "the yearbook staff and I did not object to a statement relating to capital punishment but rather objected to the particular language used." *Id.* It also appears from this affidavit that the material for the senior section of the yearbook has been submitted to the publisher and that the editors have received proofs from the publisher for review. As matters now stand, all of the material indicated in the Plaintiff's information sheet will appear in the yearbook next to her picture except for the designated quote.

Defendants have also submitted the affidavit of Emily L. Moll, a senior at Brunswick High School who serves as the arts editor and layout editor for the 1984 yearbook. She states that this position "entails a variety of duties, including review of formats, design placement (along with other members of the staff), and participation in decisions of what is appropriate material to represent the student yearbook, student body and the administration." Moll affidavit at ¶ 2. Ms. Moll states that she spoke in front of the entire senior class of Brunswick High School at a senior assembly and explained the filling out of the information sheets, including the selected quotation to be printed next to the individual senior student's picture. She describes a pertinent part of her presentation as follows:

To the best of my knowledge and recollection, this is what I verbally stated to the senior class on September 23, 1983: "No words or phrases about alcohol, sex, drugs or implying anything about those things or ideas are acceptable to the 1984 Brunswick High School Yearbook. Good taste, common sense and decorum should be exercised by the student body in choosing their quote for what goes next to their picture." I remember further saying: "Don't be jerks, use your common sense. Don't submit anything to the yearbook staff for publication that is seemingly distasteful or inappropriate or that you won't want your kids to read fifteen years from now. We will just have to return it for revision, so please save us all the unneeded effort. Let's have the best yearbook ever and thank you."

*Id.* at ¶ 5. The affidavit demonstrates Ms. Moll's continued objection to the inclusion of the Plaintiff's designated quotation in the 1984 yearbook "since it is distasteful and not appropriate for a yearbook." *Id.* at ¶ 6. Ms. Moll says that she suggested to the Plaintiff that "she modify the language without changing the expression of her view on capital punishment" and suggested alternative sources of similar quotations. *Id.* at ¶ 6.

The affidavit of the Defendant Millett, principal of Brunswick High School, is also part of the record. In it he states that on November 7, 1983, Plaintiff "came to my office to appeal a decision by the yearbook staff regarding her activity sheet." Millett affidavit at ¶ 2. He states that he denied the appeal but advised Plaintiff that "she could appeal my decision to the superintendent." *Id.* Millett thereafter had conversations with the Plaintiff's father, William A. Stanton, and with an attorney for the Plaintiff. Both men indicated that the Plaintiff did not wish to utilize an appeal process which Millett had described to them in those conversations. Thereafter, on December 12, 1983, a meeting was scheduled between the Plaintiff, her parents, their counsel, and the Defendant Millett and Defendant's counsel. Defendant's counsel was unable to attend the meeting but the meeting went forward under the direction of Daniel A. Calderwood, the superintendent of schools. It is simply asserted that as a result of that meeting, "the dispute was not resolved." *Id.* at ¶ 5.

Mr. Millett asserts that school records reflect that the Plaintiff was present at school on September 23, 1983, the date of the senior assembly described in the Moll affidavit. He also indicates that he has discussed publishing deadlines with the publisher of the yearbook. As Millett understands the situation:

[T]he proofs of the senior section which have been received by the yearbook staff should be returned as soon as possible. The senior section will then normally be printed, thus assuring a shipping date of no later than June 1, 1984. However, if return of the proofs is delayed until ap-

proximately January 20, 1984, or if changes are made prior to that time, the publishing and shipping schedules would not be altered. Changes to the proofs subsequent to Januaury 20, 1984, but prior to February 20, 1984, could result in either extension of the shipping date or an additional charge of up to $1,000 to maintain the original shipping date. Changes to the proof subsequent to February 20, 1984, could result in both an additional charge of up to $2,000 and extension of the shipping date."

*Id.* at ¶ 8.

Finally, Defendants have submitted the affidavit of Daniel A. Calderwood, superintendent of schools in Brunswick, Maine, which deals with the factual predicate for Defendants' defense of Plaintiff's alleged failure to exhaust administrative remedies.

On January 6, 1984, Defendants filed their answer to the Plaintiff's complaint, which sets out general and specific admissions and denials of the allegations of substantive facts set forth in the original complaint, thus generating the substantive factual issues in this litigation. In addition, the answer asserts the following affirmative defenses to the Plaintiff's claim for relief: (1) failure to state a claim upon which relief can be granted; (2) lack of jurisdiction in this Court as a result of Plaintiff's failure to name the proper parties; (3) lack of this Court's jurisdiction because the named defendant, Defendant Brunswick School Department, is not a suable entity under Maine law;[2] (4) lack of this Court's jurisdiction under 28 U.S.C. § 1343 because of the absence of any "state action" in this case; and (5) lack of jurisdiction in this Court due to the failure of the Plaintiff to exhaust her available administrative remedies.

Since the filing of the documents of the Defendant referred to hereinabove, Plaintiff's counsel has filed a reply brief accompanied by a supplemental affidavit of the Plaintiff. In that affidavit, the Plaintiff states that she attended the senior assembly at which Ms. Moll spoke and describes

---

**2.** The Plaintiff's initial Verified Complaint, accompanied by a motion for a temporary restraining order, was filed with the Court on December 21, 1983. That complaint named as Defendants the Brunswick School Department and Gerald Millett, the high school principal. After the application for interlocutory injunctive relief was scheduled for hearing by the Court, Defendants filed, on January 6, 1984, their answer, which set out, *inter alia,* as affirmative defenses that: (1) the complaint failed to name the proper parties; and (2) the Brunswick School Department is not a suable entity. Plaintiff filed on January 10, 1984, an Amended Complaint, which names as Defendants the Brunswick School Department, the Brunswick School Board, Daniel Calderwood, the superintendent of schools, and Gerald Millett, the high school principal. The Amended Complaint is not verified as required by Fed.R.Civ.P. 65(b)(1). Defendants have not yet filed a responsive pleading to the amended complaint.

At the hearing, Defendants objected to the Court's consideration of the content of the Amended Complaint because, pursuant to Fed. R.Civ.P. 15(a), the amendment is untimely and can be granted only by leave of Court, "which leave shall be freely given when justice so requires." *Id.* The Court granted such leave on January 11, 1984. The Amended Complaint realleges without significant change or addition the substantive factual allegations of the original Verified Complaint. The only significant change made by the latter pleading is to add as additional Defendants the Brunswick School Department and Daniel Calderwood, the Brunswick Superintendent of Schools. Though the pleading was served upon counsel for the original Defendants, the record reflects no proof of service upon, nor any acceptance of service by, these new Defendants. For present purposes, therefore, they are not yet subject to the jurisdiction of the Court. In addition, the Amended Complaint is not verified. Accordingly, its contents may not be considered by the Court in granting interlocutory injunctive relief. Fed.R. Civ.P. 65(b)(1). For that reason, Plaintiff's request for interlocutory injunctive relief is considered solely on the basis of the substantive factual allegations of the initial Verified Complaint.

The Court need not adjudicate at this juncture the viability of the "proper party" and "suable entity" affirmative defenses since the Court unquestionably has jurisdiction over the high school principal, Mr. Millett, as a party defendant. The record clearly shows that he is the principal of the high school. The Court may grant effective interlocutory injunctive relief in this proceeding by an injunction directed against him and all others acting in concert with him. Defendants' counsel represented at oral argument that any injunction issued by the Court against Mr. Millett would be accorded legal effect by the Defendants.

her recollection of it in the following language:

It lasted for approximately 40 minutes and was devoted almost exclusively to a presentation by a gentleman whose name I do not know about a magazine subscription drive. The purpose of the subscription drive, which was to take place in Brunswick, was to, among other things, raise money for the senior class because members of the senior class would be selling the subscriptions to Brunswick businesses. At the end of the period, for no more than five minutes, Ms. Moll made some remarks about the yearbook. I remember that she said, 'Don't be jerks, use your common sense. [Don't submit anything] you don't want your kids to read fifteen years from now. We will just have to return it for revision so please save us all the unneeded effort. Let's have the best yearbook ever and thank you.' I have no recollection of her saying anything else to which she refers in her affidavit.

Plaintiff's supplemental affidavit at ¶ 3. Plaintiff further states that at the time the information sheets were passed out, "we were given no instructions, either oral or written, about the contents of the sheet." *Id.* at ¶ 4. The affidavit also contains assertions that Plaintiff is generally familiar with the contents of student quotations and other similar student material utilized in prior editions of the Brunswick High School Yearbook. She states: "My interest in the questions of crime and punishment began when I read *In Cold Blood* by Truman Capote in my sophomore year in high school. We discussed that book at home and in particular talked about whether capital punishment was a suitable punishment for the defendants who had committed such a horrible crime." *Id.* at ¶ 7. She further states:

The reason I chose the quotation I selected was to possibly provoke some of my classmates to think a little more deeply than if I had written a standard butterfly quote. I wanted to make them aware of the realities that exist in today's world. The issue isn't that of capital punishment alone, but of those realities of which [sic]

people prefer to avoid. It is important to think about these things because we are seniors and we are going to be on our own very soon."

*Id.* at ¶ 8.

## II. JUSTICIABILITY

Original jurisdiction of the Plaintiff's action pursuant to 42 U.S.C. § 1983 is conferred upon this Court by 28 U.S.C. § 1343(3). The complaint sufficiently alleges state action that subjects the Plaintiff to an actual deprivation of civil rights which are guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. The controversy of which the complaint seeks resolution is ripe for the exercise of Article III judicial power arising under the Civil Rights Act and the First and Fourteenth Amendments. Venue is properly laid in the District of Maine where all Defendants reside and the action arises. 28 U.S.C. § 1391(b). There is no requirement of federal court abstention presented by this matter since there are no unsettled questions of state law requiring clarification by the courts of the State of Maine. *See Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Likewise, there are no pending or required state judicial or administrative proceedings warranting abstention. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

## III. PRELIMINARY INJUNCTIVE RELIEF

As previously noted, the Court treats the pending motion for a temporary restraining order as a motion for preliminary injunction in view of the fact that notice and opportunity for hearing have been afforded to the Defendants with respect to the issues raised by the Plaintiff's claim of entitlement to temporary injunctive relief pending further proceedings and a determination of those issues on the merits. *Supra,* at 1561. Plaintiff must satisfy four essential requirements in order to prevail

on a claim for temporary injunctive relief. This Court has had occasion in the past to set out succinctly those requirements in *UV Industries, Inc. v. Posner*, 466 F.Supp. 1251, (D.Me.1979) (per Gignoux, J.):

> It is well settled law that, in the ordinary case, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Id.* at 1255; *see also Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (per Gignoux, J.). This formulation of these criteria has been approved by the United States Court of Appeals for the First Circuit. *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (*quoting Women's Community Health Center, Inc.*); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969); *Automatic Radio Manufacturing Co. Inc. v. Ford Motor Co.*, 390 F.2d 113 (1st Cir.1968) *cert. den.*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). This Court has only recently indicated the continuing applicability of these requirements to requests for temporary injunctive relief. *Sheck v. Baileyville School Committee*, 530 F.Supp. 679 (D.Me.1982) (per Cyr, J.).

Further, it is well established law that the Court is to bear constantly in mind that an "[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." *Plain Dealer Publishing Co. v. Cleveland Type. Union #53*, 520 F.2d 1220, 1230 (6th Cir.1975), *cert. den.* 428 U.S. 909, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1977). The Court's hesitation to utilize so drastic an aspect of its prerogative should be heightened where the relief requested is only temporary in nature. *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1047 (C.D. Cal.1977).

Moreover, the Court should only sparingly exercise its authority to issue an interlocutory injunction which requires a defendant to take affirmative action. *Jones v. Snead*, 431 F.2d 1115 (8th Cir. 1970). The purpose of preliminary injunctive relief is to preserve the *status quo* until a final adjudication can be had upon the merits. *Toledo, A.A. to N.M. Ry. Co. v. Pennsylvania Co.*, 54 F. 730 (C.C.N.D. Ohio 1893). In framing the terms of a preliminary injunction the Court is to go no further than is necessary to preserve the litigating posture of the moving party and must avoid any unnecessary encroachment upon that of the adverse party.

Indeed, the Court cannot seriously consider equitable relief as drastic as that proposed by Plaintiff which would effectively act as a final determination of the issue. It is clear that "[a]ny denial of plaintiff's rights pending a determination on the merits would work an irretrievable loss of constitutionally-guaranteed liberties for which no adequate remedy exists at law." *Sheck*, 530 F.Supp. at 684 (emphasis in original). The injunction proposed by Plaintiff, however, would cause a similarly irretrievable loss to Defendants if they must publish Plaintiff's quotation before the case is decided on the merits and their position ultimately prevails. A temporary injunction which simply prevents the Defendants from authorizing final printing and publication of the yearbook until resolution of this controversy will adequately protect Plaintiff's rights without foreclosing the possibility of relief for Defendants. This narrower remedy accords with the conservative mode described above as appropriate for the consideration of preliminary injunctions. The Court will, therefore, apply the traditional analysis to this more limited remedy.

### (1) *Irreparable Injury*

Plaintiff in this case founds her claims on alleged deprivations of her First and Fourteenth Amendment rights resulting from the Defendants' denial to her of the opportunity to have her selected quotation published in the 1984 yearbook. "It is

well established that the loss of First Amendment freedoms constitutes irreparable injury. *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976)); *Sheck,* 530 F.Supp. at 684; *see also Keefe v. Geanakos,* 418 F.2d 359 (1st Cir.1969). Plaintiff's claim that she stands at risk of being denied the exercise of her right of free expression of her ideas, secured by the First Amendment, constitutes a colorable showing, rising above a "chilling effect," *see Maceira,* at 18, of a denial of her constitutionally-secured prerogatives. Money damages will not suffice to redress such a deprivation of Plaintiff's one-time opportunity to have her ideas published in the yearbook, which opportunity has been made available to her classmates. Such would be the case even if there were no legal impediments to the recovery of damages in this action. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### (2) *Weighing the Competing Harms to Plaintiff and Defendants*

■ In balancing the hardships that might be occasioned by the Court's action (or inaction), it is clear that failure of the Court to enter any injunctive relief would cause Plaintiff irreparable harm. The temporary injunction postponing publication until after final resolution of this case would prevent this harm while causing only minor difficulties for Defendants.

The affidavits of the Defendants establish only that printing and publication schedules have been established. It is not demonstrated that any harm rising above the level of inconvenience and the incurring of modest additional publishing costs, much less any irreparable harm, will result from delay of those printing and publication schedules. While it is asserted that such delay may occasion increased expense in the form of publication costs, it is not shown that these Defendants will bear those costs. Even if it were so shown, those charges would hardly constitute irreparable injury by comparison to the harm that would be done to the Plaintiff's constitutionally-protected First Amendment

rights by presently scheduled publication of the yearbook without the inclusion of her designated quotation. Further, offsetting the significance of the possibility of delay resulting from the granting of interim injunctive relief, is the fact that given the limited scope of the injunctive relief considered by the Court, *supra* at 1567, the school authorities will not be prevented from or inhibited in proceeding as scheduled with the preparation of all aspects of the yearbook except the one page of the senior section on which Plaintiff's photograph and allied data will appear. Finally, it is not shown that there is any irreparable harm which will result *to these Defendants* in the event that the ultimate outcome of such delay should be that no 1984 yearbook is published.

It is clear, on balance, that the protection of the Plaintiff's constitutionally-based interests predominate on the present factual calculus, and that an adequate showing has been made that the Plaintiff's potential injury, in the absence of temporary injunctive relief, will outweigh any harm which the granting of an appropriately-framed injunction would inflict on these Defendants.

### 3. *Plaintiff's Likelihood of Success on the Merits*

Plaintiff here asserts a claim which challenges the right to *initiate* expression. In this respect the case differs from *Sheck,* 530 F.Supp. 679, 685–6, with respect to the primacy of the value of the conduct which is claimed to be protected by the First Amendment right of free speech. In *Sheck,* this Court recognized a qualitative distinction, for analytical purposes, between official conduct which restricts a student's "right to receive information and ideas, *the indispensible reciprocal of any meaningful right of expression,*" *id.* at 685 (emphasis in original), and the right to initiate expression. In the present case there is no question that the alleged conduct of the Defendants is claimed to prevent the publication of a quotation expressing the Plaintiff's idea in a claimed public forum. As such, the claim is indisputably that the official conduct infringes upon her

First Amendment right *to initiate* expression. *Id.* That right is clearly and expressly granted to her by the First Amendment and it is not necessary for analytical purposes, as it was in *Sheck, supra,* to establish the meaningfulness of the Plaintiff's claimed right. We deal here with the right of expression itself in its most direct exercise.

In assessing whether Plaintiff is likely to succeed with her claim that the school authorities have infringed her right to initiate expression, it is necessary to consider the specific issues raised by the pleading posture of this case. These are:

(a) Whether Plaintiff is required to exhaust available administrative remedies before seeking relief in this Court under Section 1983;

(b) Whether the yearbook is a public forum for the expression of ideas;

(c) Whether the alleged restriction of the Plaintiff's First Amendment right of free speech was accomplished under color of state law;

(d) Whether the content of the standard actually applied to reject for publication the Plaintiff's designated quotation meets constitutional requirements as a basis for restricting the First Amendment right of free speech;[3]

*(a) Exhaustion of State Remedies*

■ The Defendants contend that the Plaintiff may not pursue this action under § 1983 without first exhausting administrative remedies available in the form of an appeal of the decision of the principal of the high school to the Brunswick School Board. This contention is not well founded. The United States Supreme Court, in a long series of decisions beginning in 1963, has rejected the argument that a § 1983 action must be dismissed where the plaintiff has not exhausted state administrative remedies. *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *see also Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 2120, 20 L.Ed.2d 1319 (1968); *King v. Smith,* 392 U.S. 309, 312, n. 4, 88 S.Ct. 2128, 2131, n. 4, 20 L.Ed.2d 1118 (1968); *Damico v. California,* 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *cf. Steffel v. Thompson,* 415 U.S. 452, 472–3, 94 S.Ct. 1209, 1222–3, 39 L.Ed.2d 505 (1974). This line of decisions has been recently capped by the United States Supreme Court's decision in *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). There, the

**3.** Defendants also raise as a defense that a temporary injunction cannot require them to violate the rights of *Time* magazine under the Copyright Law, 17 U.S.C. § 106, *et seq.,* by publishing without permission copyrighted material from the magazine. The issue is not immediately generated for decision in these proceedings since this Court's preliminary injunction will not require Defendants to publish anything. The issue must be considered, however, in a predictive context in determining whether Plaintiff has demonstrated a "substantial likelihood of success on the merits."

Plaintiff does not dispute that her designated quotation is copyrighted material. She does assert that its proposed use in the 1984 yearbook will not be an infringement of *Time* magazine's copyright under the "fair use" doctrine authorized by 17 U.S.C. § 107. That statutory provision excepts from the category of infringement, "the fair use of a copyrighted work ...

for purposes such as ... comment ...." *Id.* The statute then prescribes four criteria to be applied to determine if a particular use qualifies as an excepted "fair use" under § 107.

The Court has considered the use proposed here in the light of the statutory criteria. In view of the nature and substantiality of the use (e.g., publication of a two-line segment out of a six-page magazine article in a noncompeting high school yearbook to convey an ethical conviction); the nature of the copyrighted work (e.g., an internationally-circulated weekly news magazine); and the total lack of any economic effect upon the commercial value of the copyright, the Court is completely satisfied that such an issue at trial would be resolved in favor of a determination that publication of Plaintiff's designated quotation in the 1984 yearbook was within the "fair use" exception of § 107. *See Triangle Publications v. Knight-Ridder Newspapers,* 626 F.2d 1171, 1177 (5th Cir.1980).

Court, after a general review of the legislative history of § 1983 found that

[t]his legislative history supports the conclusion that our prior decisions, holding that exhaustion of state administrative remedies is not a prerequisite to an action under § 1983, did not misperceive the statutory intent: it seems fair to infer that the 1871 Congress did not intend that an individual be compelled in every case to exhaust state administrative remedies before filing an action under § 1 of the Civil Rights Act.

*Id.*, at 507, 102 S.Ct. at 2563. After additionally considering various policy considerations which were there argued to support the imposition by judicial decision of a requirement of exhaustion of administrative remedies, the Court stated: "[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Id.* at 516, 102 S.Ct. at 2568. The foregoing authorities make clear that this Plaintiff need not exhaust administrative remedies available within the Brunswick School Department before seeking to vindicate her First Amendment rights under § 1983. A substantial likelihood exists, therefore, that the Plaintiff will prevail on this issue when this case is finally determined.

(b) *The Yearbook as a "Public Forum"*

The next issue raised by Plaintiff's claim is whether or not the yearbook is a public forum for the expression of ideas. The Court notes that Plaintiff alleged in the original complaint that:

For the last ten years, or thereabouts, the defendant School Department has published a high school yearbook at the conclusion of each and every school year. That yearbook has contained a section in which appear the pictures of all of the members of the senior class as well as biographical information about each such student *and a short quotation selected for inclusion by the students.*

Complaint, at ¶ 4 (emphasis added). By their answer, the Defendants admitted the allegations of paragraph 4 of the complaint. Answer, at ¶ 4. Defendants' affidavit of Ms. Harlow states:

The senior section of the yearbook consists of individual photographs of seniors. They are allowed to submit information on an activity sheet relating to nickname, *a quote*, activities, likes, dislikes, and future goals. This information is then reviewed and edited by the yearbook staff including faculty advisors for accuracy, appropriateness, punctuation, and length.

Harlow affidavit at ¶ 3 (emphasis added). Attached to the affidavit of Mr. Millett, the principal of the high school, as Exhibit D, is a copy of the 1983 Brunswick High School Yearbook. An examination of that exhibit demonstrates beyond any doubt that in the 1983 yearbook each picture of a senior student is accompanied by a quotation reflecting the student's philosophical, social, ethical or other personal views of life. None of the affidavits submitted by Defendants controvert to any extent the factual proposition that in past years the Brunswick High School Yearbook has been permitted, as a matter of fact, to serve the purpose of affording a forum in which senior students may express their personal views, opinions, and ideas through the selection of quoted material. Those affidavits also make it clear that that practice is intended to be continued in the preparation of the 1984 Brunswick High School Yearbook.

 The present record of this case, therefore, contains a forceful showing that, completely apart from the question of whether or not the school authorities could be *required* to provide a vehicle for the expression and transmission of personally-held views on matters of importance to senior students, the Brunswick High School Yearbook has now been so utilized for a period of years under the *aegis* of those representatives of the school department who are charged with preparing and publishing the yearbook. The record shows an intent to continue this practice in the 1984 yearbook. Those representatives of the school system, acting within the scope of their authority, as that is displayed on the present record, have created

of the Brunswick High School Yearbook a *de facto* public forum for the expression of senior students' personal ideas. At trial on the merits of this proceeding, further evidence may be adduced upon this issue. However, the present record amply demonstrates a substantial likelihood that the Plaintiff will prevail in establishing the "public forum" status of the 1984 Brunswick High School Yearbook.

### (c) *Action "Under Color of State Law"*

Defendants contend that Plaintiff has not demonstrated that Defendants rejection of her designated quotation for publication was done "under color of state law" as required by 42 U.S.C. § 1983. *See Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The Defendants base this contention on the premise that "[t]o date, the responsible governmental entity— the Brunswick School Board—has taken no action at all; it has not yet even had the opportunity to do so." Defendant's Memorandum of Law, at 14.

■ Defendants' argument too rigidly restricts the scope of the "under color of state law" requirement of § 1983. That requirement does not mandate for its satisfaction action by the governmental authority ultimately responsible for activity authorized by law. That requirement is satisfied as well by a showing that the acts complained of are performed by any person who acts pursuant to authority conferred upon that person, or derived by the person from others, pursuant to state law.

The record here reflects that the preparation and publication of the high school yearbook is an integral part of the general program of secondary education provided under the auspices of the Brunswick School Board, which is charged by Maine law with overseeing the education of Brunswick's citizens. That program involves the participation of students who act under the supervision of assigned faculty members of the high school. The operations of the editorial board are subject to the review and oversight of not only the assigned faculty members, but that of the assistant principal, principal, and, ultimately, of the superintendent of schools. Although initially student editors rejected Plaintiff's designated quotation, at least one faculty advisor participated in and ultimately ratified that decision. Both the high school principal and the assistant principal subsequently concurred in that decision and the reason given for it. The superintendent of schools participated in efforts to "resolve" the issue and has done nothing to change or overturn the decision reached by school employees at any lower level of the administrative chain of command.

■ Nothing in the record suggests that the oversight and review activities of the Brunswick school officials mentioned above have been conducted in any way other than in the course and scope of their activity and duties as agents of the school board. Their actions are patently taken for purposes of implementing the educational programs and policies of Brunswick as they are formulated by the school board pursuant to 20 M.R.S.A. § 1011. Those officials are clearly the agents of the board and their acts are thus sanctioned by law. Their acts are, by elemental rules of law, the acts of the school board itself. Plaintiff, therefore, has shown a substantial likelihood of prevailing at trial on the question of whether Defendants acted "under color of state law" in rejecting the Plaintiff's designated quotation.

### (d) *The Constitutional Adequacy of the Defendants' Publication Standard*

We must now consider the constitutional legitimacy of the standards that were applied by the editorial board and the school authorities to restrict Plaintiff's right of free expression. It is to be noted preliminarily that issues may exist at trial as to whether there was in fact any established standard for such purposes. If so, further questions may arise as to the specific content of the standard, and, perhaps, whether the content of any such standard was ever communicated to the Plaintiff. The Court's present inquiry is limited, however, to a determination of the likelihood of Plaintiff's success on the merits. Such a determination is predictive in nature, and

the Court in making it is constrained by the contents of the record now before the Court. It is not necessary to make any factual prediction concerning the standard, however, because the present record shows that the standard actually applied, in any formulation supported by the record, cannot pass constitutional muster. No possible formulation of the standard provides criteria that are sufficiently objective and specific to distinguish publishable material from that which is not publishable.

We must recognize at the inception of this inquiry that:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.

*Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); *see Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Because of the paramount significance which our basic political doctrine extends to free expression as a vehicle for the fostering of that premise, free public expression may not be subjected to governmentally sponsored censorship by vague, subjective or nondiscrete standards. Public officials may not exercise untrammeled discretion in regulating the content of public speech. *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974); *see Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Free public expression cannot be burdened with governmental predictions or assessments of what a discrete populace will think about good or bad "taste." "The social value of the conceptual and emotive content of censored expression is not to be sacrificed to arbitrary official standards of vocabular taste without constitutional recourse." *Sheck,* 530 F.Supp. at 687. As Justice Harlan aptly stated in *Cohen v. California:*

Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result.... [I]ndeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.... [M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressable emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

*Cohen,* 403 U.S. at 25–6, 91 S.Ct. at 1788–89.

Here the Plaintiff asserts that she feels strongly about the issues of murder and capital punishment. She selected her designated quotation to "provoke some of my classmates to think a little more deeply than if I had written a standard butterfly quote." Plaintiff's supplemental affidavit, at ¶ 8. She seeks to convey her message, in part at least, through the "shock effect" of graphic prose. She seeks to utilize the "emotive function" of language. Yet, it is precisely because the chosen language serves that function well that the quotation has been rejected because, it is said, it is "inappropriate."

Giving to the people the right of individual expression free from unwarranted governmental interference must ultimately be seen as a calculated, historical gamble to which, through the vehicle of the Constitution, the Founding Fathers have committed

this nation and its people so long as the Constitution shall endure. Mr. Justice Black saw accurately their assessment of the risks inherent in that gamble:

> Since the earliest days, philosophers have dreamed of a country where the mind and spirit of man would be free; where there would be no limits to inquiry; where men would be free to explore the unknown and to challenge the most deeply rooted beliefs and principles. Our First Amendment was a bold effort to adopt this principle—to establish a country with no legal restrictions of any kind upon the subjects people could investigate, discuss, and deny. The Framers knew, better perhaps than we do today, the risks they were taking. They knew that free speech might be the friend of change and revolution. But they also knew that it is always the deadliest enemy of tyranny. With this knowledge they still believed that the ultimate happiness and security of a nation lies in its ability to explore, to change, to grow and ceaselessly to adapt itself to new knowledge born of inquiry free from any kind of governmental control over the mind and spirit of man. Loyalty comes from love of good government, not fear of a bad one.

Black, *The Bill of Rights*, 35 N.Y.U.L.Rev. 865, 880–1 (1960).

We need not shrink from the hazards of a free people saying without restraint what they believe. We have a sufficient security in the Framers' profound conviction that the decency and sound judgment of an *informed* citizenry will, in good time, winnow the rash statement from the reasonable one, reject the foolish proposal for the principled one, discern the zealot from the diplomat, and distinguish the demagogue from the democrat. That conviction is our substitute for the more immediately attainable safety provided by government control, in the name of "taste" and "appropriateness," of what we as individuals may say and write. It sustains our rule that the exercise of official discretion in proscribing certain content of public speech must reflect a specific and considered judgment restricting speech only in terms of a particular time and place for the achievement of a discernible and reasonable public goal, *see Grayned v. City of Rockford*, 408 U.S. 104, 121, 92 S.Ct. 2294, 2306, 33 L.Ed.2d 222 (1972), and that the government is constrained to the use of reasonably precise and ascertainable standards in implementing any regulation of free expression. *Keyishian v. Board of Regents*, 385 U.S. 589, 603–4, 87 S.Ct. 675, 683–4, 17 L.Ed.2d 629 (1967).[4]

The Defendants' regulation of Plaintiff's speech in this case is based upon the imposition of a standard that is shown, by the existing record, to be phrased in various terms.[5] Plaintiff's designated quotation was not rejected for publication because it "involved alcohol, sex or drugs" or views that implied "anything about those things." Moll affidavit at ¶ 5. The record makes clear that the quotation was rejected because it was "not appropriate for the yearbook," Harlow affidavit at ¶ 6, "inappropriate since it was in poor taste," Bumgardner

---

**4.** The need for ascertainable and specific standards is dictated by at least three purposes: (1) to apprise the citizen who seeks to speak of what he may, in a specific circumstance, properly aspire to express; (2) to provide to responsible officials criteria that are objective and discrete in order that they may respond fairly to the legitimate interests of the citizen; and, finally (3) to provide to the courts, where they are called upon to do so, some factually-based and meaningful basis upon which they may adjudicate controversies arising out of conflict between the constitutionally-based rights and interests of the citizen and the rationally-based needs of society at large and of the government.

**5.** The standard, in one formulation, *allows* publication of material that is "tasteful and appropriate for all students and the community in 1984 and in future years." Harlow affidavit at ¶ 5. In another formulation it *proscribes* material "which involved alcohol, sex or drugs, or was distasteful or inappropriate for a Brunswick High School Yearbook." Bumgardner affidavit at ¶ 3. By still another version, it enjoins students to exercise "[g]ood taste, common sense and decorum" in selecting a designated quotation. Moll affidavit at ¶ 5. The students were told not to "submit anything ... that is *seemingly distasteful* or inappropriate or that

affidavit at ¶ 7,[6] and "distasteful and not appropriate for a yearbook," Moll affidavit at ¶ 6. The principal, Mr. Millett, *denied an appeal from those decisions* of the editorial staff of the yearbook and its faculty advisors with no indication that any additional ground for rejection was considered by him.

Rejection of Plaintiff's designated quotation on the basis of a standard of "poor taste" or "appropriateness" either to the yearbook or to some narrow segment of public opinion, such as Brunswick High School seniors, or to a wider segment, such as the populace of Brunswick, fixes no discrete, objective limits to the determination of what may or may not be published therein. That test must always be, by such standards, completely subjective in at least two respects; what the official making the decision as to publishability thinks to be "tasteful" or "appropriate" *and* what that official believes others may think to be so.

The vagueness and uncertainty of the standard is geometrically increased when it is prospectively applied, as was done here, through a period of future years. If the intellectual and ideological ferment of the last four decades of the American social experience teaches anything, it teaches us that whatever may be the accepted meaning of "good taste" on any given day, the content of that meaning does not rigidly abide through time. The passage from the acceptability in the public forum of the content of the *Esquire* magazine of the 1940s to that of *Hustler* in the 1980s is not an historical accident. It is, rather, an historical proof that the open expression of individual views and tastes, the exposure of the public to new and challenging ideas, and the promotion of a continually widening exposure of the society to new information is effective to shape the public consensus. These are all processes which underlie and are intended to be secured by the First Amendment. To deny the reality of

their contribution to our well-being is to deny alike the value of the eloquence and courage of a General Washington addressing his troops at Valley Forge, a President Kennedy inspiring the nation at his Inaugural, or of a Martin Luther King bespeaking the conscience of the nation from the steps of the Lincoln Memorial. These historical phenomena take their driving force from the dynamic effect of free expression by a free people. The sense of vigor which they bring to the direction of the affairs of the Republic may not be denied in fact and that driving force may not be suppressed by government intervention in the name of "good taste" and "appropriateness."

The criteria shown by the existing record to have been actually applied here as a basis for the rejection for publication of the Plaintiff's designated quotation failed to address adequately any of the constitutional requirements. They do not, therefore, pass constitutional muster as criteria sufficient in content to limit the Plaintiff's right to free expression of her ideas in a public forum. If these criteria are ultimately shown to be all that was applied to deny Plaintiff her First Amendment right, she will clearly prevail at trial on this aspect of her claim.

#### 4. *The Public Interest*

Justice Frankfurter framed lucidly the pertinent calculus when he said that the right of free expression "means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525 (1944). In the legitimate exercise of her right of free speech, this Plaintiff has the option to convey her conviction by the use of the most graphic language, even, if she so chooses, by language so physiologically stark that others may believe her to "be a jerk." [7]

---

you won't want your kids to read fifteen years from now." *Id.* (emphasis added).

**6.** Assistant Principal Fairbrother agreed with Mrs. Bumgardner that "the quote was inappropriate." Bumgardner affidavit at ¶ 7.

**7.** *See* Moll affidavit at ¶ 5; Plaintiff's supplemental affidavit, at ¶ 3.

Government has no legitimate nor compelling interest in preserving this lone woman from that fate if her own utterances shall visit it upon her. Rather, the First Amendment declares that the highest interest of the people is best served if government is required to stay its hand and permit her, and millions like her, to take upon their personal risk the ability of their ideas and convictions to survive and propagate in the marketplace of ideas. It is a matter of little moment, in the larger sense, whether she fails in that endeavor; it is of vital moment that she and her idea not be denied, by the instrumentalities of the political establishment, the *opportunity to succeed* in that marketplace. It is, indeed, of paramount importance to the public interest that she have that opportunity. *See, Sheck*, 530 F.Supp. at 693. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).

The public interest may be thought to be best served if schools and teachers practice the historical orthodoxies of our political freedom while they preach the temporally transitory orthodoxies of "taste." They may legitimately, and should, seek to inculcate the latter, but they may not, in the effort to do so, transgress upon the former. In the final analysis, under our Constitution, individual liberty of expression must be accorded its day even at the expense of the promotion of aesthetic sophistication. *See Keyishian*, 385 U.S. at 603, 87 S.Ct. at 683.

In light of the careful limitation of the scope of the Court's preliminary injunction, no countervailing public interest is damaged by the injunction. The Court requires the Defendants to do nothing save to hold their hand with respect to *final* publication until the rights of both parties to this litigation may be finally adjudicated. The Defendants are no more entitled to commit the preclusive act of final publication in advance of that adjudication *without* Plaintiff's designated quotation than is the Plaintiff entitled to have the Court require, in advance thereof, an equally preclusive

publication *with* the quotation. The injunction will not interfere in any other respect with the activities of the school authorities in preparing the yearbook against the day of a publication when this Court will have performed its constitutional function. Thus will be avoided "any irreparable loss of important individual liberties during the interim before the parties can be fully heard on the merits." *Sheck*, 530 F.Supp. at 679. Yet, any significant intrusion upon the public policy that the Court not "intervene in the resolution of conflicts which arise in the daily operation of school systems ... which do not directly and sharply implicate basic constitutional values," *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), is minimized. The limited interim injunctive relief here granted serves the public interest in all respects.

### 5. *Conclusion*

The Court concludes that the Plaintiff has made a strong showing of entitlement to preliminary injunctive relief preventing final publication of the 1984 Brunswick High School Yearbook until a final adjudication on the merits of this action. *See Planned Parenthood v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). A preliminary injunction shall issue forthwith in the form and substance of Appendix "A" attached hereto.

So ORDERED.

### APPENDIX "A"

### PRELIMINARY INJUNCTION

Plaintiff's motion for a Temporary Restraining Order having come on for hearing and argument on January 11, 1984, and notice and hearing thereon having been ordered by the Court, and the motion now being considered by the Court as one for a Preliminary Injunction, and the Court having this date separately made its findings of fact and conclusions of law in its Findings of Fact, Conclusions of Law, Opinion and Order of this date,

IT IS HEREBY ORDERED, that the Defendant Gerald Millett and all others acting in concert with him, be, and are hereby, enjoined from authorizing, allowing,

causing or permitting, pursuant to any authorization, permission or order therefore previously given or to be given after this date, any final printing, publication, or distribution of a 1984 Brunswick High School Yearbook prior to this Court's final adjudication of the merits of the above-entitled matter, the content of which shall exclude therefrom the Plaintiff's designated quotation, viz:

> "The executioner will pull this lever four times. Each time 2000 volts will course through your body, making your eyeballs first bulge, then burst, and then broiling your brains ..."

from the Senior Section thereof next to the photograph and biographical data previously submitted by Plaintiff and approved for publication therein by the yearbook editorial staff and said Gerald Millett.

Nothing contained in this Preliminary Injunction shall preclude the interim preparation, including printing, of other material to be included in said 1984 Brunswick High School Yearbook in accordance with existing or other schedules of the editorial staff.